LASKEY BROS. OF W. VA., Inc., et al., Plaintiffs-Appellants,

v.

WARNER BROS. PICTURES, Inc. (In Dissolution) et al., Defendants-Appellees.

AUSTIN THEATRE, Inc., et al., Plaintiffs-Appellees,

v.

WARNER BROS. PICTURES, Inc. (In Dissolution) et al., Defendants-Appellants.

Nos. 338, 343, Docket 23610, 23672.

United States Court of Appeals Second Circuit.

Argued June 6, 7, 1955.
Decided July 13, 1955.

Bruno Schachner, New York City (Malkan & Ellner and Arnold Malkan, New York City, on the brief), for plaintiffs-appellants in Laskey action and plaintiffs-appellees in Austin action.

Bruce Bromley, New York City (John Logan O'Donnell and Leo P. Arnaboldi, Jr., New York City, on the brief), for defendants-appellees in Laskey action and defendants-appellants in Austin action.

Louis Phillips, New York City, for defendants Paramount Film Distributing Corp., Paramount Pictures, Inc. (In Dissolution), and Paramount Pictures Corp.

R. W. Perkins, New York City, for defendants Warner Bros. Pictures, Inc. (In Dissolution), Warner Bros. Pictures, Inc. (Delaware), and Warner Bros. Distributing Corp.

Dwight, Royall, Harris, Koegel & Caskey, New York City, for defendants Twentieth Century-Fox Film Corp. (In Dissolution), Twentieth Century-Fox Film Corp. (Delaware).

Benjamin Melniker, New York City, for defendant Loew's Incorporated.

J. Miller Walker, New York City, for defendants RKO Radio Pictures, Inc., and RKO Pictures Corp.

Milton Handler, New York City, for defendants Comerford Theatres, Inc., and Comerford Publix Theatres Corp.

Phillips, Nizer, Benjamin & Krim, New York City, for defendant United Artists Corp. in Laskey action only.

O'Brien, Driscoll & Raftery, New York City, for defendants RKO Keith-Orpheum Theatres, Inc., and RKO Theatres Corp.

Schwartz & Frolich, New York City, for defendants Stanley Warner Management Corp., Stanley Warner Corp., Fabian Theatres Corp., and Columbia Pictures Corp.

Leopold Friedman, New York City, for defendants Loew's Theatre and Realty Corp., sued herein as Loew's Theatre and Realty, Inc.

Before CLARK, Chief Judge, CHASE, Circuit Judge, and RYAN, District Judge.

CLARK, Chief Judge.

These appeals involve the qualification of the firm of Malkan & Ellner to serve as attorneys for plaintiffs in private anti-trust actions involving the motion picture industry. Disqualification was sought by the defendants on the basis of Malkan's prior partnership with one Isacson. In proceedings independent of those here under review, Isacson has been found to have obtained confidential information about the defendants in the course of his former employment by the firm of Sargoy & Stein. The history of this litigation is set forth in detail in the opinion of the district court in this proceeding, so that we need not repeat it here. D.C.S.D.N.Y., 130 F.Supp. 514. Judge Dawson concluded that Malkan & Ellner should be disqualified in the Laskey case, which had originally come to the firm of Malkan & Isacson. The plaintiffs and the attorneys appeal from this determination. In the Austin case —the second of these two actions heard and decided together below—Judge Dawson decided that the new firm was not disqualified, since this client had come to it by channels completely apart from Malkan's former association with Isacson. Here the defendants appeal.

The defendants rely heavily in both cases on a stipulation which they read as barring, as a matter of contract law, any representation of motion-picture anti-trust-action plaintiffs by these attorneys. The stipulation in question was entered into before the formation of the firm of Malkan & Ellner, in the course of the litigation in Fisher Studios, Inc. v. Loew's Inc. then pending in the District Court for the Eastern District of New York. In that case the qualification

of Isacson and the firm of Malkan & Isacson was first raised; and, in view of the pendency of similar suits elsewhere, the parties stipulated that: "If it shall be finally determined in this action that David H. Isacson and Malkan & Isacson are qualified or disqualified, and if such determination in this proceeding is that such qualification or disqualification embraces 35 mm. anti-trust actions, 16 mm. anti-trust actions and under-reporting actions, such determination shall be binding upon David H. Isacson, Malkan & Isacson, and the defendants herein, in all cases involving 35 mm. anti-trust actions, 16 mm. anti-trust actions and under-reporting actions, including those hereinabove mentioned." Since the Fisher proceedings resulted in the disqualification of Isacson and the firm of Malkan & Isacson by Judge Abruzzo, defendants urge us to enforce this stipulation against Malkan and Malkan & Ellner in these cases.

The decision in the Fisher case has been appealed, but not yet argued. For present purposes, therefore, we accept the actual disqualifications entered there. But beyond this we cannot agree that the stipulation should affect any cases other than those which came to Malkan & Isacson or to Isacson individually. The wording of the stipulation seems unambiguously to exclude disqualification of Malkan as an individual. There is no reason to invoke complicated theories of partnership law to construe so clear a document which on its face evidences no intent to bind Malkan except in his role as a partner to Isacson.

Defendants also contend that the stipulation is binding on Malkan because Judge Abruzzo so held in a decision which should be held res judicata here. Judge Abruzzo was repeatedly asked by the defendants to bar Malkan individually from this litigation, and repeatedly refused to do so, until his attention was focused on the stipulation. This caused him to issue an amended order of disqualification to cover "Malkan & Isacson, David H. Isacson and Arnold G. Malkan, as a member of the firm of Malkan & Is-

acson and * * * any firm with which they or any of them may now or hereafter be associated." In the same order he refused, however, to pass upon the qualification of the firm of Malkan & Ellner. Furthermore, the photostatic copy of the order in the record discloses that it originally purported to cover "Arnold G. Malkan individually and any firm with which the said Arnold G. Malkan may be associated," and that this version was changed to substitute therefor "Arnold G. Malkan as a member of the firm of Malkan & Isacson." The stress which Judge Abruzzo placed on this correction is shown by the fact that he wrote and initialled it in three separate places. It seems fairly clear, therefore, that the judge did not intend to exclude Malkan individually. Even if his order can be so read, we think, as did Judge Dawson, that it cannot be res judicata in these cases affecting two completely independent plaintiffs and involving the qualification of a new law firm, Malkan & Ellner, as to which Judge Abruzzo specifically refused to rule.

Even thus limited, the stipulation does, however, support Judge Dawson's ruling in the Laskey case. That plaintiff first came to the firm of Malkan & Isacson to initiate an anti-trust action in the Western District of Pennsylvania. Subsequently a new suit was begun for this plaintiff by Malkan & Ellner in the Southern District of New York, but it is not contended that these suits differ in any material respect. It seems clear that under the stipulation the firm of Malkan & Isacson was barred from prosecuting this case. We would come to the same conclusion without the stipulation, since all authorities agree that all members of a partnership are barred from participating in a case from which one partner is disqualified. Consolidated Theatres v. Warner Bros. Circuit Management Corp., 2 Cir., 216 F.2d 920; Note, Disqualification of Attorneys for Representing Interests Adverse to Former Clients, 64 Yale L.J. 917, 920; Drinker, Legal Ethics 106 (1953). And once a partner is thus vicariously dis-

qualified for a particular case, the subsequent dissolution of the partnership cannot cure his ineligibility to act as counsel in that case. The decision in Laskey is therefore affirmed.

This brings us to the more difficult question of legal ethics posed by the Austin case. This case came to the new firm of Malkan & Ellner through channels having nothing whatsoever to do with Malkan's prior association with Isacson. Judge Dawson decided that disqualification of the firm of Malkan & Isacson should not carry over to Malkan & Ellner in the absence of any showing that Malkan had received confidential information from Isacson.

Defendants contend that either receipt of confidential information should be conclusively presumed from the fact of partnership or alternatively Malkan should at least have the burden of rebutting such an inference. Within the framework of the original partnership the fact of access to confidential information through the person of the partner with such specialized knowledge is sufficient to bar the other partners, whether or not they actually profit from such access. Such a result, although an extension of the literal wording of Canons 6 and 37 of the Canons of Professional Ethics of the American Bar Association, is necessary to facilitate maximum disclosure of relevant facts on the part of clients. Once the partnership is dissolved, however, the inference from access to receipt of information, in a new case having no relationship to the old partnership, becomes logically less compelling and should therefore become rebuttable legally, lest the chain of disqualification become endless.

Thus an irrebuttable inference that confidential information had been received would result in Malkan's disqualification for partnership with Isacson, and Ellner's disqualification for partnership with Malkan. Since the degree of association to effect disqualification need not necessarily be that of a partner, young lawyers might seriously jeopardize their careers by temporary affiliation with large law firms. But even more important is the effect on litigants who may seriously feel they have claims worthy of judicial testing, but are prejudiced in securing proper representation. For the net effect of an over-harsh rule of disqualification must be to hinder adequate protection of clients' interests in view of the difficulty in discovering technically trained attorneys in specialized areas who were not disqualified, due to their peripheral or temporally remote connections with attorneys for the other side. See Note, 64 Yale L.J. 917, 928. The necessity of judicial recognition of the contingent fee is an appropriate analogy.

In this case Malkan has successfully met the burden of rebutting the inference that he received confidential information from Isacson. Malkan testified in a hearing before Judge Dawson that he had received no such information, and Judge Dawson obviously believed him. The only indications to the contrary to which the defendants advert are that Malkan and Isacson signed complaints in several anti-trust actions involving the distribution of motion pictures, and that Malkan and Isacson together solicited clients for their firm. This is not enough to overcome the favorable effect of Malkan's testimony and demeanor as appraised by the trial judge. Malkan had long been engaged in private anti-trust actions in other fields before he met Isacson, and can be presumed to have had independent know-how on the drawing of an appropriate complaint in such an action. The alleged solicitation, on which there was no clear ruling in the Fisher proceedings, is irrelevant to the question of violation of confidences. It will not do to make the presumption of confidential information rebuttable and then to make the standard of proof for rebuttal unattainably high. This is particularly true where, as here, the attorney must prove a negative, which is always a difficult burden to meet.

We therefore conclude that the judgment in the Austin case must be affirmed.

In both appeals the orders are affirmed.

RYAN, District Judge (dissenting).

These appeals present the question whether the professional obligations of Arnold G. Malkan, J. Robert Ellner, and the law firm of Malkan & Ellner prevent them from continuing to appear for and represent the plaintiffs in two private anti-trust suits filed against a number of motion picture producers, distributors and exhibitors.

The plaintiff in each suit moved in the District Court for an order declaring that these attorneys and the law firm were "qualified to represent it"; the defendants thereupon cross moved for an order "disqualifying" them. The motions came on before Judge Dawson, who, after hearing, held in the Laskey suit that "Arnold G. Malkan and the law firm of Malkan & Ellner and J. Robert Ellner as a member of said firm are disqualified from representing the plaintiff" and in the Austin suit that "Arnold G. Malkan, J. Robert Ellner and the law firm of Malkan & Ellner may properly represent and are not barred or disqualified from representing the plaintiff." Appeals have been filed by the aggrieved parties from the orders entered by Judge Dawson on these determinations.

Judge Dawson reached this result in the Laskey suit by finding that disqualification to act as attorney for the plaintiff Laskey existed because that corporation had previously retained and was represented by the law firm of Malkan & Isacson in which Malkan had been a partner. And, it was because the plaintiff Austin had never retained Malkan & Isacson and had come to Malkan after the dissolution of that firm, that Judge Dawson concluded there was no disqualification in the Austin suit.

This court is in unanimous agreement with the ruling of Judge Dawson in the Laskey suit, except that I would not limit Ellner's disqualification to the period during which he continues a member of the firm of Malkan & Ellner, but would declare Ellner, as Malkan, disqualified from acting as attorney for any client seeking to enforce a private anti-trust motion picture claim against these defendants. I would modify the order entered in the Laskey suit to so provide. The ethical obligations which here disqualify Ellner from appearing as attorney for the plaintiffs in these suits are personal to him as an individual and as a member of the Bar; he may not free himself of them simply by breaking off his professional associations or shed them as a change of attire.

I disagree with my distinguished colleagues as to the Austin suit; as to it I would sustain the appeal, and enter an order of disqualification equally as broad in scope as in Laskey.

Because I subscribe to the belief that

"Unless courts delineate the various policy considerations motivating their decisions, precedents offer little guidance to attorneys seeking to fulfill their ethical obligations" (The Yale Law Journal, Vol. 64, p. 928, May, 1955),

I feel impelled to write at length.

To properly appraise the ethical obligations of Malkan and Ellner to the defendants their prior professional activities and associations must be ascertained and this is particularly so with respect to Malkan's association with David H. Isacson.

In November, 1946, Isacson entered the employ of the law firm of Sargoy & Stein. It was at the time a large office. He remained in their employ until March, 1951.

For several years prior to Isacson's employment the firm had represented a number of motion picture companies in prosecuting claims for rental of motion picture films arising from alleged under-reporting of box office receipts by theatre licensees. Sargoy & Stein would cause theatre box office audits to be made by their staff and in almost 500 instances caused suit to be filed to collect on alleged under-reportings. Isacson at first took part in these audits and later spent the major portion of his time tak-

ing depositions in examinations before trial. These depositions covered many phases of the relationship of the theatres with the motion picture companies. To assist him in taking these depositions Isacson had complete access to the firm's files which contained an abundance of data and information, not only gathered by this law firm but also disclosed to and confided in it by the motion picture companies concerning the manner in which the companies did business in the 16 mm. as well as the 35 mm. field.

The firm also assisted the general counsel of the motion picture companies in the preparation and defense of a number of private anti-trust suits filed against them. Much of the confidential data in the firm's files was collated and gathered in this work; it concerned the licensing of 16 mm. pictures for exhibition; the limitations, if any, on the distribution, and the terms of the licenses.

Isacson's professional status in the firm rose in importance within a short time. His name was placed on the firm letterhead by October, 1947. He soon left off routine work of the audits and took part in the ensuing litigation. Of the 464 under-reporting suits filed while he was with Sargoy & Stein, in at least 233 of them anti-trust defenses or counterclaims had been interposed. Isacson took some part in 170 of these suits and participated in taking depositions in 72, and at least in 31 interrogated witnesses concerning anti-trust claims. Isacson also participated in litigation involving 35 mm. pictures in which anti-trust violations were alleged.

Sargoy & Stein also investigated information which it had received from 16 mm. dealers, concerning the illegal duplicating of 16 mm. prints; among these dealers was Robert V. Fisher who occasionally visited the office of the firm and Carl J. Kunz.

There is no question but that Isacson, while in the employ of Sargoy & Stein, enjoyed the confidence and trust of the firm and of their clients in the motion picture industry. He had unrestricted access to the confidential data they had disclosed to the firm; and much of this would unquestionably be of great assistance to one prosecuting a claim of an anti-trust violation against those companies. An obligation of fidelity and loyalty was voluntarily assumed by his employers; Isacson was in the same way bound to the firm's clients; his obligation was no less than that of his employers, the partners of the firm; and that obligation remained with him after he left the firm in March, 1951 with respect to the confidences in which he had shared.

Isacson, admitted to the Bar in 1940, had prior to his employment by Sargoy & Stein no extensive experience as an attorney. After graduation from law school he had worked for a time for several attorneys and from 1942 to 1945 had been employed as a welder in shipyards. He served a short time in the Army and then had been unsuccessful in establishing a law practice. It was with this very limited professional training that he had come to Sargoy & Stein. After leaving them he had handled occasional legal matters for friends and had represented his father in the purchase and subsequent sale of a garage and for a time assisted in operating it. For sixteen months or so he unsuccessfully sought legal employment and tried to rejoin Sargoy & Stein. Finally, Isacson was introduced to Malkan by a cousin who had been a classmate of Malkan's in law school. After several months of discussion the law firm of Malkan & Isacson was formed in July, 1952.

At the time Malkan had a fairly well equipped office in operation; Isacson brought in but little furniture. Malkan testified that "it was not an equal partnership"; as to certain major pending litigation Isacson had no specific share but would be compensated for any work he might do; and as to "matters which Mr. Isacson might bring in, and as to matters in the motion picture field with

the exception of certain matters which were more or less under negotiation with me at the time, he and I would share equally in motion picture fees, and he would have some share in any new cases that I got after that."

At the time of this association between Malkan and Isacson, Malkan had been consulted in connection with private anti-trust motion picture litigation but he had not been retained. While they were together the firm had a number of these cases. It is undisputed that in the major portion of the litigation in which the two-man firm of Malkan & Isacson appeared they represented plaintiffs in treble damage anti-trust suits, and that prior to the formation of the firm Malkan had been quite active in litigation of this type, but not in the motion picture field. Isacson supplied the technical knowledge of the operations in this industry, which Malkan lacked; Malkan furnished the office, the practical experience in the prosecution of plaintiffs' anti-trust claims and, it seems from his statements, the financial support necessary to the firm. This was all well, except that Isacson also brought with him to this new venture in the motion picture field knowledge of all the anti-trust data which had been gathered by Sargoy & Stein from information imparted to them and their staff by their clients.

In the Independent Film Journal, issue of August 9, 1952, there appeared a squib reading—

> "David H. Isacson, formerly with the law firm of Sargoy & Stein, became associated with Arnold Malkin, prominent New York attorney
> *   *   *"

Isacson had been doing a bit of photographic work for a few years. Although the article in "doctored photographic form" accompanied by announcement cards was sent by him to four or five persons, there is no direct proof that Isacson's skill accomplished the job. In the altered form, the misspelling of Malkan's name was corrected and following this the words "anti-trust" were inserted between the words "New York" and "attorney," and the name of the publication with the date line was shifted so as to appear immediately below the article.

At least sixty-five announcements were sent out; a half dozen or more went to exhibitors or attorneys for exhibitors; on some Isacson wrote personal notes. In one note to an attorney, who represents independent exhibitors, Isacson wrote that since his days with Sargoy & Stein he had "come to see the light and have undertaken to represent exhibitors (the salt of the earth, God bless them)." An announcement and copy of the altered article were sent to two motion picture exhibitors who were then parties to litigation against clients of Sargoy & Stein.

It was against this background that the new combination of Malkan & Isacson appeared as attorneys for Fisher Studio Inc. and Robert V. Fisher, plaintiffs, in a private anti-trust suit filed in the Eastern District of New York in September, 1952. This suit involves charges of restraints on 16 mm. film.

Robert V. Fisher had called at the office of Sargoy & Stein during 1946 and 1948. He had met Isacson in the Spring of 1948 there. In August, 1952, after Fisher read of the suit filed by the Government in the District Court for the Southern District of California against Twentieth-Century Fox-Film Corporation, et al., he discussed with Isacson the question of filing a complaint by Fisher Studio against the distributors of 16 mm. film and retained Isacson. Fisher apparently thought it a good idea to inform others in the industry of what he was doing and later Isacson addressed a meeting attended by 10 or 12 people out of 30 invited.

The defendants in the Fisher suit moved to disqualify Malkan and Isacson and the firm. Judge Abruzzo on November 19, 1952 referred the matter to Harold F. McNiece, Esq., as Special Master to hear and report. Mr. McNiece is a member of the Bar exceptionally well qualified and competent to perform such

a task. Numerous hearings were held by him and he filed a comprehensive report on April 19, 1953. The report is part of the record before this Court. In it the facts recited above are found. The Master noted that—

"Mr. Isacson was present throughout the hearings. He * * * was throughout a most unimpressive witness. * * * His memory was particularly poor on matters which were unfavorable to him, though ofttimes remarkably good on favorable ones. * * *"

The Special Master found, when denying a motion to strike from the record evidence of solicitation—

"The evidence of solicitation shows that Mr. Isacson peddled confidential information and violated his duty toward his former clients and is therefore relevant on the confidential information issue."

After the filing of the Special Master's report, Judge Abruzzo by order filed April 13, 1954 disqualified Isacson and the firm of Malkan & Isacson from representing the plaintiffs in the Fisher suit.

An appeal was filed from this order, but it has not been brought on for hearing. Argument on the instant appeals was made on the premise that the order of disqualification of Isacson was properly made. Indeed, on the record this is clearly so.

While the matter was pending before Mr. McNiece in the Fisher suit, the attorneys for the defendants and the attorneys for Isacson and Malkan & Isacson entered into a stipulation in which along with other matters it was provided—

"11. If it shall be finally determined in this action that David H. Isacson and Malkan & Isacson are qualified or disqualified, and if such determination in this proceeding is that such qualification or disqualification embraces 35 mm. anti-trust actions, 16 mm. anti-trust actions and under-reporting actions, such determination shall be binding upon David H. Isacson, Malkan & Isacson, and the defendants herein, in all cases involving 35 mm. anti-trust actions, 16 mm. anti-trust actions and under-reporting actions, including those hereinabove mentioned."

Following Judge Abruzzo's order the firm of Malkan & Isacson was dissolved about July 1, 1954. About a month later the firm of Malkan & Ellner was formed. It was found by Judge Dawson that as to Malkan—

"* * * his partnership with Mr. Isacson and his present partnership with Mr. Ellner have not been real partnerships 'because neither of them share in any losses'. As to Mr. Ellner, he said: 'I felt that it would be a nice thing for Mr. Ellner to have his name associated as a partner. It would help him bring in business and would not cost me anything in particular and, again, he was not to share in any of the pending cases, except in my discretion'. * * *" [130 F.Supp. 517.]

Concerning the dissolution of the firm of Malkan & Isacson, Judge Dawson wrote:

"The testimony of Mr. Malkan indicated that when he formed a partnership with Mr. Isacson in 1952, it was agreed between them that as to matters which Mr. Isacson might bring into the firm and as to motion picture litigation, the fees would be shared equally between them. Mr. Malkan further testified that there was no written agreement of dissolution of the firm of Malkan & Isacson, but a fair summary of the situation would be to say that Mr. Malkan took over most of the antitrust actions then pending in the office and that Mr. Isacson took over most of the general matters. He stated that most of the motion picture anti-trust actions had been taken on a contingent fee basis, and that although Mr. Isacson had

brought most of them in and had done a substantial part of the work which had been done on them, Mr. Isacson retained no interest in any fees that thereafter might be collected on any contingent fee arrangements. He stated, however, that there was no written agreement with Mr. Isacson to this effect, but indicated that he had paid Mr. Isacson $5,000 for services rendered in connection with other anti-trust actions, and that this was considered by him to be in full settlement of any interest that Mr. Isacson had in the firm or in any matters pending in the firm. The lack of any formal agreement of dissolution or any formal settlement of the affairs of the firm is strange. It might be contended that Mr. Isacson either had a continuing interest in any contingent fees that might thereafter be obtained on cases brought to the office by him or, in the alternative, that the $5,000 paid to him was a payment for any claim that he might have to share in those contingent fees."

It was after the firm of Malkan & Ellner was established that the Laskey and Austin suits were filed in the Southern District of New York on November 6, 1954. The defendants in both suits are substantially the same corporations —some 58 in number and all in the motion picture industry. Many of the defendants in these suits were clients of Sargoy & Stein, when Isacson was there employed and were also defendants in the Fisher suit. Both the Laskey and Austin suits are 35 mm. anti-trust actions against distributors. The claims alleged in both suits are in substance predicated upon the same restraints as alleged in the Fisher suit.

The Laskey matter came to Malkan & Isacson through Isacson; a suit was filed in 1953 in the Western District of Pennsylvania by Malkan & Isacson; the same issues are there presented as in the suit in the Southern District of New York;

this prior suit in Pennsylvania is still pending. It was in the New York suit that the order of disqualification to which one of the appeals has been filed was made.

I agree with Judge Dawson's observation that—

"As Mr. Malkan, as well as Mr. Isacson, was disqualified from handling that case at a time when it first came to their office, this disqualification cannot be cured by the dissolution of the partnership. Once the attorney was disqualified from handling the case, he remains disqualified."

I am unable to follow the removal of this disqualification from Malkan and his new associate Ellner and the approval of the continuance of their employment in the Austin suit.

Isacson was disqualified because of his former engagement by a law firm representing the defendant corporations. While so employed he occupied a position of great moral trust and confidence. From his confidential position there attached to him an obligation which was voluntarily assumed by all who later joined with him in the practice of the law. It attached to Malkan if for no other reason than that he became a partner of Isacson and it attached to Ellner upon his association with Malkan.

Partners in a law firm do not dwell in cubicles; they all must observe and respect the confidence and trust a client has reposed in any one of them; they divide the fees and rewards of faithful service; they join in a common acceptance of responsibility to a client; they jointly and severally represent the clients; all are bound to each and every client of the firm by a relationship of trust and confidence, and are bound by such relationship which has at any time existed as to any former client of any one partner. It seems to me that to hold otherwise is to view the practice of the law as a business rather than as a profession. The principles to guide us in

fixing the extent of professional obligations of the Bar are not to be looked for in the market place.

As to the Austin suit Judge Dawson found that it first came to Malkan after the partnership with Isacson had been dissolved and that Isacson had not had any connection with that case. He held that Malkan, Ellner and Malkan & Ellner were qualified to represent the plaintiff, and wrote—

"There has been no evidence presented that Mr. Malkan acquired such confidential information, and the burden would be upon the defendants to assert or offer proof that he had acquired such confidential information. This they have not done."

I do not agree that the burden is upon the defendants. It is far too great a task to place upon a former client seeking protection against disclosure of his confidences to require him to establish by proof that the confidence he placed in one partner has been disclosed to other partners. Assuming arguendo that such burden is upon the client, the record before us, while it contains no direct evidence of disclosure by Isacson to Malkan and subsequent disclosure by Malkan to Ellner, contains more than ample evidence to support the inference that such disclosure did in fact occur. Direct evidence would be well nigh impossible to obtain; the circumstances shown lead to one rational conclusion.

The defendants have the burden of establishing that a relationship of trust and confidence existed between them and the member of the Bar whom they seek to disqualify. This burden, they have concededly sustained as to Isacson by affirmative proof; Malkan and Ellner are bound by reason of the circumstances surrounding Malkan's associa-

tion with Isacson and his subsequent association with Ellner. The defendants further need only show that these attorneys who owe them loyalty and fidelity have undertaken to represent adverse parties in matters in which the confidences given are involved. This, the defendants have done.

The ethics of the situation are tersely expressed in the third paragraph of Canon 6 of the Canons of Professional Ethics of The American Bar Association, which reads—

"The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed."

It is by application of this principle that Malkan, Ellner and the firm of Malkan & Ellner are disqualified in the Laskey suit. That disqualification attached to Malkan, not only by reason of association as a partner with Isacson in the practice of the law, but also by reason of the confidence which partners place in one another and the joint obligation to the former clients of any partner of the firm. Ethical obligations place both Malkan and Ellner individually in the same moral position as Isacson.

I would reverse in Austin and enter an order of disqualification as in Laskey.

The economic hardship, if any there be, resulting to Malkan and Ellner, while not pertinent, seems far less than that imposed on the attorney in Consolidated Theatres v. Warner Brothers, etc., 2 Cir., 1954, 216 F.2d 920, 926. I have in reaching my decision disregarded the stipulation which was entered into in the Fisher suit.