**Thomas P. HUNTINGTON, et al., Plaintiffs,**

v.

**GREAT WESTERN RESOURCES, INC., et al., Defendants.**

**Dario CIOTI, et al., Plaintiffs,**

v.

**GREAT WESTERN ENERGY CORPORATION, Defendants.**

**Dario CIOTI, et al., Plaintiffs,**

v.

**GREAT WESTERN ENERGY CORPORATION, et al., Defendants.**

**Nos. 86 CIV 3320 (LBS), 86 CIV 6886 (LBS) and 86 CIV 6887 (LBS).**

United States District Court, S.D. New York.

March 18, 1987.

Fischer Kagan Fredericks Ascione Zaretsky & Scarinci, Clifton, N.J., for plaintiffs; Barry Fredericks, of counsel.

Baskin Flaherty Elliott Mannino & Gordon, P.C., Washington, D.C., for moving defendants; Gene Schleppenbach, of counsel.

SAND, District Judge.

Defendants Amtax Management Corp. ("Amtax"), Petroleum Income Associates ("PIA") and M. Walter Levine (collectively, the "Amtax defendants") move to disqualify attorney Barry Fredericks and Certilman Haft Lebow Balin Buckley & Kremer ("Certilman"), the firm of which Fredericks was a member when the motion was made, from representing the plaintiffs in three related lawsuits. The motion arises in an unusual and somewhat complex factual context. For the reasons explained below, we are compelled to grant the motion to disqualify.

In deciding a motion to disqualify, a court is called upon to apply principles that will preserve the delicate balance between an individual's right to choose his own attorney and the court's obligation to maintain high professional standards and to ensure that the trial of the claims in the case will be free from taint. *See Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562, 564 (2d Cir.1973); *see also Armstrong v. McAlpin*, 625 F.2d 433 (2d Cir.1980) (*en banc*), *vacated on other grounds and remanded*, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981).

Ethical issues, of course, "cannot be resolved in a vacuum." *Emle, supra*, 478 F.2d at 565. Disqualification questions "are intensely fact specific." Miller and Warren, *Conflicts of Interest and Ethical Issues for the Inside and Outside Counsel*, 40 Bus.Lawyer 631, 633 (Feb.1985). It is essential, therefore, to approach problems such as those presented in the defendants' motion with a keen sense of practicality as well as a precise picture of the underlying facts.[1] As Judge Kaufman wisely cautioned as a district judge:

---

1. It has been recognized that motions to disqual- ify are often filed for "tactical reasons." *Bd. of*

When dealing with ethical principles, it is apparent that we cannot paint with broad strokes. The lines are fine and must be so marked. Guideposts can be established when virgin ground is being explored, and the conclusion in a particular case can be reached only after painstaking analysis of the facts and precise application of precedent.

*United States v. Standard Oil Company,* 136 F.Supp. 345, 367 (S.D.N.Y.1955) (footnote omitted). We turn, therefore, to the peculiar context in which we decide this motion.

### Background

A brief review of the nature of the lawsuits is an appropriate starting point. The underlying actions were instituted by investors in certain oil and gas limited partnerships. The investors charge in the complaints that the defendants violated an array of federal securities laws as well as other federal statutes and common law principles in connection with the organization and operation of three oil and gas investment projects: (i) Great Western Energy 1982 ("GWE 1982"), (ii) Great Western Energy 1983–I ("GWE 1983–I"), and (iii) Great Western Energy 1983–II ("GWE 1983–II") (collectively, the "Programs").[2]

At all relevant times, defendant Levine controlled the corporate defendants, Amtax and PIA. Levine and Amtax, it is alleged, were the selling agents for the Programs. *See, e.g.,* Complaint, 86 Civ. 6886, at ¶ 20. Defendant PIA allegedly played a somewhat different role; it is alleged to be a joint venturer with the lead defendant, Great Western Energy Corporation ("GWEC"), in GWE 1982 and GWE 1983–I. The complaints charge that the Amtax defendants failed to satisfy legal duties they owed to the investors. For example, plaintiffs allege that Amtax and Levine failed to fulfill the obligation to make a diligent investigation to ensure the truth of statements contained in the offering material. *See, e.g.,* Amended Complaint, 86 Civ. 3320,

*Ed. of N.Y. City v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir.1979).

at ¶ 89; Complaint, 86 Civ. 6886, at ¶ 56; Complaint, 86 Civ. 6887, at ¶ 56.

Turning to the circumstances that bear directly on the motion to disqualify, it is clear that Certilman (then "Wofsey, Certilman, Haft & Lebow") represented one or more of the Amtax defendants before, during and after the formative period of GWE 1982 and GWE 1983–I. Defendant Levine, in an affidavit, states that the firm represented both him and Amtax on a variety of general corporate and tax matters. *See* Affidavit in Support of Motion for Disqualification ("Levine Affidavit") at ¶ 3. Indeed, the firm considered itself in February 1982 to be Amtax's "legal counsel," a designation which Certilman permitted Amtax to use in a corporate brochure. *See* Levine Affidavit, Exh. B.

More specifically, the record indicates that the Certilman firm assisted the movants in a broad range of transactions that led to the assumption of their respective roles in GWE 1982 and GWE 1983–I. Levine affirms, and the circumstances suggest, that during the course of this representation, Certilman became familiar with the operations of Amtax as well as certain aspects of the relationship between the Amtax defendants and the Programs that may be relevant to the ultimate disposition of these suits. *See, e.g.,* Levine Affidavit at ¶ 4. The relevant invoices indicate, for example, that in 1982, lawyers with Certilman assisted in the preparation of a broker-dealer agreement which, the movants claim, sets forth the rights and duties of Amtax and GWEC with respect to the offering of limited partnership units. *See* Levine Affidavit at ¶ 7 and Exh. D. Certilman attorneys played a part in negotiating and drafting a "fee and expense sharing letter agreement" between Amtax and GWEC. *See* Levine Affidavit at ¶ 6 and Exh. D. The firm also represented PIA in the formation of its 1982 joint venture with GWEC. Furthermore, in the summer of 1982, Certilman "reviewed for form and

2. There are three actions which are directly relevant here. 86 Civ. 3320 relates to GWE 1983–II. 86 Civ. 6886 relates to GWE 1983–I. 86 Civ. 6887 relates to GWE 1982.

substance the Confidential Private Offering Memorandum of Great Western Energy, Ltd. 1982 Oil and Gas Program," one of the documents which plaintiffs allege Levine and Amtax failed to review adequately. *See* Levine Affidavit at Exh. C.

Certilman's representation of the Amtax defendants in reference to the Programs terminated sometime in early to mid–1983. It appears that Certilman's representation of defendant Levine, however, continued until sometime in 1985. In this period, the firm represented Levine in a litigation matter, apparently unrelated to the present actions, then pending in the Eastern District of New York. Evan Gordon, a Certilman litigation partner, handled the case. By that time, Certilman's representation of investors who would ultimately become plaintiffs in the present actions had commenced.

Barry Fredericks, the individual attorney whose representation of the plaintiffs movants challenge here, joined Certilman as a partner in November 1984 and continued his affiliation through December 31, 1986. His membership in the firm therefore originated approximately twenty months after the end of Certilman's representation of the Amtax defendants with respect to GWE 1982 and GWE 1983–I. Fredericks was, however, with the firm at the time of its representation of Levine in the Eastern District litigation. At that point, it appears that Fredericks was the head of Certilman's litigation department.

Soon after Fredericks joined the firm, he became involved in a series of discussions with investors who were dissatisfied with the Programs. These discussions eventually led Fredericks and the Certilman firm, on behalf of certain of the investors, to commence the present actions.

The genesis of these discussions is not altogether clear. It appears that Fredericks first met in December 1984 with two investors: Dario Cioti, and his accountant, Norman Greene. Cioti, it seems, was "an ongoing client" of the Certilman firm and Fredericks' initial contact with Cioti occurred through the offices of other Certilman lawyers. *See* Transcript of Proceedings ("Transcript"), 86 Civ. 3320, at 4 (Feb. 19, 1987). It is not clear, however, who at Certilman introduced client Cioti to attorney Fredericks. Nor is it clear whether the lawyers who attended the initial meeting with Fredericks and Cioti—or any other Certilman lawyers—performed any work in connection with the present cases.[3] At oral argument, Mr. Fredericks stated:

> Cioti was an ongoing client of Certilman Haft. When I joined them in—I joined them in November of 1984. In December[,] or January of '85, I was the head of the litigation department. They called me in and said, 'Meet Mr. Cioti, Mr. Levine, Mr. Green and Mr. Letewka. They've got some problems concerning some oil and gas investments that they made several years ago.'

Transcript at 4–5. Fredericks affirms that the initial discussions with the investors "were in general terms concerning [the investors'] inability to obtain information from the project and certain representations made to them which they believed were false." Affidavit [of Barry Fredericks] in Opposition to Defendants' Notice of Motion to Disqualify Plaintiff's Counsel ("Fredericks Affidavit") at ¶ 3.

In early 1985, soon after Fredericks and his firm commenced the representation of Cioti with respect to his Great Western investments, there followed a flurry of activity relative to the composition of the partnerships and possible ways to settle the investors' potential claims. There were, for example, several meetings between disgruntled investors and individuals who would ultimately become defendants in these actions. Levine himself was represented at these meetings by attorneys from Stroock, Stroock & Lavan. Fredericks, too, attended the meetings at Cioti's request. In late 1984 and early 1985, the record indicates there were "numerous discussions" between Levine and Fredericks re-

---

**3.** A Certilman lawyer other than Fredericks entered into a stipulation adjourning the return date of this motion on behalf of the plaintiffs. *See* Stipulation, 86 Civ. 3320, 86 Civ. 6886, 86 Civ. 6887 (Dec. 18 1986).

lated to the concerns of Certilman's investor clients. *See* Levine Affidavit at ¶ 10. Fredericks, it appears, was of the belief that "Mr. Levine was instrumental in putting numerous people into the Great Western projects...." Fredericks Affidavit at ¶ 4. Fredericks understood that the "purpose of the [initial] meeting [between investors and Levine] was to discuss Mr. Levine's recent visit to Texas for the purposes of determining what was happening with the various Great Western projects." Fredericks Affidavit at ¶ 4. Levine affirms that during the course of these meetings he was elected to replace GWEC as the general partner of GWE 1983–I. Fredericks, however, openly expressed his view during this period of negotiation and investigation that the interests of the Certilman firm's clients (Cioti, et al.) were adverse to those of Levine. *See* Fredericks Affidavit at ¶ 4.

Although the precise date cannot be determined, at Fredericks' first meeting with Levine, Levine told Fredericks that Fredericks' law firm, Certilman, had previously represented the Amtax defendants in connection with GWE 1982 and GWE 1983–I. According to Levine, "Mr. Fredericks was made aware of the many files that Certilman Haft had on GWE, Amtax, PIA and myself. Mr. Fredericks gave me the impression that he had [reviewed] or would review those files." Levine Affidavit at ¶ 10.

After being advised of this prior representation, which obviously created a conflict, Fredericks "proceeded to discuss the problems with Cioti and company" and throughout 1985 gathered information that

would eventually lead to the filing of the complaints in these actions. *See* Transcript at 6. Later that year, months after his initial discussions with Levine, attorney Fredericks was approached by a group of stockbrokers who had also invested in the Programs. One of the brokers was a client of a firm with which Fredericks had been affiliated prior to his association with Certilman. *Id.* at ¶ 6. The grievances these investors discussed with Fredericks paralleled those of the Certilman clients with whom Fredericks initially spoke and whom Certilman was then representing. As settlement prospects in the overall dispute declined, case preparation intensified. By the Fall of 1986, while Fredericks was still a member of the Certilman firm, the complaint in each of the three actions had been filed.

■ By Notice of Motion dated November 21, 1986, the Amtax defendants moved, *inter alia*, to disqualify Certilman and Barry Fredericks from representing the investors.[4] The return date originally established was thereafter adjourned on consent.[5] In the meantime, Fredericks resigned from Certilman and joined the firm of Fischer Kagan Ascione & Zaretsky,[6] which then was substituted as counsel for the plaintiffs.

### Discussion

■ Certilman, as we noted, was the law firm which represented the plaintiffs both when the complaints in these actions were filed and when the motion to disqualify was made. Thereafter, the firm withdrew as

---

**4.** There is no evidence that the disqualification motion was made simply to delay the proceedings. The earliest case, 86 Civ. 3320, was filed in mid–1986. The other cases were filed in the fall of that year. Less than sixty days elapsed from the docketing of the affidavit of service on the movants of the complaint in 86 Civ. 6886 and 86 Civ. 6887, actions in which Cioti is a plaintiff, and the date on which the movants filed the motion to disqualify.

**5.** There was confusion with respect to the date set for oral argument of the motion to disqualify. Mr. Fredericks failed to appear on January 29, 1987, the return date set pursuant to a stipulation executed by a member of the Certilman

firm other than Fredericks and movants' counsel. Counsel appeared to argue the motion. However, it appears that a separate stipulation had been prepared and executed by all counsel except counsel for the movants adjourning the motion to a later date. The Court indicated on January 29, 1987 that an application would be entertained for an award of costs to movants' counsel. However, upon review of the record, it appears that the confusion was genuine and that the circumstances do not warrant entry of an order awarding those costs.

**6.** The firm subsequently became known as Fischer Kagan Fredericks Ascione Zaretsky & Scarinci.

plaintiffs' counsel. In light of this train of events, Certilman, in a letter to the Court dated December 4, 1986, suggested that the motion to disqualify it was mooted by the substitution of the Fischer firm for Certilman as plaintiffs' counsel. The movants registered their disagreement with this position in a December 8, 1986 letter to the Court.

Inasmuch as Certilman no longer represents the plaintiffs, the motion to disqualify the Certilman firm is moot. Notwithstanding this fact, an exploration of the role of the Certilman firm in these actions and in the prior, adverse representation of the movants is critical to the resolution of the core issue presented here—namely, whether Barry Fredericks is personally disqualified from representing the plaintiffs because of his former affiliation with the Certilman firm.

The Second Circuit has emphasized in its most recent disqualification opinions that a court's ultimate objective in weighing disqualification questions is to ensure that the balance of presentations in a litigation will not be tainted by improper disclosures. *See Board of Education of City of New York v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir.1979); *see also Cheng v. GAF Corporation,* 631 F.2d 1052, 1058 (2d Cir.1980), *vacated on other grounds and remanded,* 450 U.S. 903, 101 S.Ct. 1338, 67 L.Ed.2d 327 (1981). Courts have been directed to take a "restrained approach that focuses primarily on preserving the integrity of the trial process." *McAlpin, supra,* 625 F.2d at 444.

A court should not hesitate to disqualify counsel in appropriate cases. A court must be mindful, however, that:

there is a particularly trenchant reason for requiring a high standard of proof on the part of one who seeks to disqualify his former counsel, for in disqualification

matters we must be solicitous of a client's right freely to choose his counsel—a right which of course must be balanced against the need to maintain the highest standards of the profession. *Government of India v. Cook Industries, Inc.,* 569 F.2d 737, 739 (2d Cir. 1978).

■■■ An attorney may not under ordinary circumstances reveal client confidences or use client confidences to the client's disadvantage. This proposition is embodied in Canon 4 and the corresponding Disciplinary Rule of the ABA Model Code.[7] The principle that client confidences are sacrosanct has led to the rule that an attorney may be disqualified from representing a client in a particular case if

(1) the moving party is a former client of the adverse party's counsel;

(2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and

(3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*Evans v. Artek Sys. Corp.,* 715 F.2d 788, 791 (2d Cir.1983).

■■■ The proper application of these factors to the Certilman firm under the facts of this case is largely undisputed. It is clear that the movants are former clients of Certilman. Furthermore, there is no doubt that the subject matter of the present litigation bears a substantial relationship to the subject matter of Certilman's prior representation of the Amtax defendants. Finally, the proposition that the Certilman firm "had access to, or was likely to have had access to, relevant privileged information" during its prior repre-

---

7. Canon 4 states: "A lawyer should preserve the confidences and secrets of a client." The Disciplinary Rule keyed to Canon 4 provides in pertinent part:

DR 4–101 Preservation of Confidences and Secrets of a Client.

(B) Except when permitted under DR 4–101(C), a lawyer shall not knowingly:

(1) Reveal a confidence or secret of his client.
(2) Use a confidence or secret of his client to the disadvantage of the client.
(3) Use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after full disclosure.

The exceptions are inapplicable here.

sentation is not challenged. *Id.* Under these circumstances, the law irrebuttably presumes that client confidences were disclosed to the Certilman firm and that the firm was disqualified from taking on the successive, adverse representation of Cioti and the other investors. Indeed, attorney Fredericks conceded at oral argument that the Certilman firm was disqualified from representing the plaintiffs. *See* Transcript at 10. That disqualification, in the Court's view, attached at the commencement of the representation of plaintiffs and continued until the firm withdrew as counsel.

What is disputed here is the proper application of the governing legal rules to Fredericks, the challenged individual attorney. Disqualification of Fredericks is sought on the theory of imputed disqualification.

■ Where one lawyer at a firm is disqualified from representing a client because it is presumed that he possesses client confidences gained in the course of a prior representation, it is also presumed that the disclosed confidences were shared with the other attorneys within the lawyer's firm. Under DR 5–105(D), "[i]f a lawyer is required to decline employment or to withdraw from representation under a Disciplinary Rule, no partner or associate ... [in] his firm may accept or continue such employment." This precept accords with the understanding that client confidences may "consciously or unconsciously" be transmitted among attorneys. *Fund of Funds, ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 234 (2d Cir.1977) (quoting from *Hull v. Celanese Corporation*, 513 F.2d 568, 570 (2d Cir.1975)). It has been recognized that the sharing among attorneys of client confidences disclosed to one attorney may be "inadvertent." *Cheng, supra,* 631 F.2d at 1058.

There is Second Circuit authority for the proposition that the presumption that client confidences have been shared among lawyers, as opposed to the presumption that a client has disclosed confidences to his lawyer, is a rebuttable one. *See Cheng, supra,* 631 F.2d at 1056; *see also Silver Chrysler Plymouth Inc. v. Chrysler Motor Corp.*, 518 F.2d 751 (2d Cir.1975) (overruled

on other grounds in *McAlpin, supra*). The opportunity for rebuttal is intended, *inter alia,* to prevent application of an "overharsh rule of disqualification" which would have the effect of prejudicing clients from "securing proper representation," especially in technical areas of the law. *Laskey Bros. of W.Va., Inc. v. Warner Bros. Pictures,* 224 F.2d 824, 827 (2d Cir.1955), *cert. denied,* 350 U.S. 932, 76 S.Ct. 300, 100 L.Ed. 814 (1956). *See also Government of India, supra,* 569 F.2d 737, 741 (Mansfield, J., concurring).

The parties have argued this motion on the theory that a rebuttable presumption standard is the appropriate analysis to apply. The typical fact pattern, with certain variations, in cases in which rebuttable presumption analysis has been adopted involves the attorney who has left a law firm or law office and has subsequently undertaken the representation of a client whose interests are adverse to those of a client of his former office. *See Silver Chrysler, supra; see also Cheng, supra.* The case at bar does not follow the common fact pattern and we have serious doubts about the wisdom of applying a rebuttable presumption in the peculiar facts of this case.

This case is similar in some respects to *Laskey Bros., supra,* an early disqualification case which is often cited to support the proposition that the Second Circuit has adopted a rebuttable presumption standard in imputed disqualification cases. *See Silver Chrysler,* 518 F.2d at 754. *Laskey Bros.* presented disqualification issues in two contexts, one involving plaintiff Laskey and the other involving plaintiff Austin. With respect to the Austin case, the district court applied a rebuttable presumption analysis. *See Laskey Bros. of W.Va. v. Warner Bros. Pictures,* 130 F.Supp. 514, 520 (S.D.N.Y.1955). However, with respect to the Laskey case, which bears a closer resemblance to the facts of this case, rebuttable presumption analysis was not applied. *Id.* at 519–520.

Both the Laskey and Austin actions were antitrust suits involving the motion picture industry. In both actions, the defendants sought to disqualify the firm of Malkan &

Ellner because of attorney Malkan's former association with an attorney named Isacson.

Malkan and Isacson had formed a law partnership, known as Malkan & Isacson, in 1952. Isacson had previously been affiliated with Sargoy & Stein, a law firm which had represented the moving defendants on matters related to the litigation in which disqualification was sought. After Malkan & Isacson was formed, Isacson and the firm were retained by Laskey to represent it in antitrust matters substantially related to matters on which Isacson had represented the defendants while at Sargoy & Stein. In 1954, Malkan & Isacson was dissolved and Malkan "took over most of the anti-trust actions then pending in the office" including the Laskey matter. *Id.* at 518. He brought the cases to his new firm: Malkan & Ellner. Malkan, the challenged attorney, had never met Laskey prior to the dissolution of Malkan & Isacson. Subsequent to Malkan's move to Malkan & Ellner, the firm was approached by Austin regarding a case which, had it been presented to Malkan & Isacson, would have triggered a disqualification because of Isacson's prior work for the defendants while at Sargoy & Stein.

The defendants contended that Malkan & Ellner, as well as the individual attorneys, were disqualified from representing the plaintiffs in both the Laskey and Austin actions. Plaintiffs argued in response that disqualification did not extend to attorney Malkan because he had severed his relationship with Isacson, the only attorney who had in fact successively represented clients with conflicting interests in substantially related matters. *Id.* at 519 n. 4.

In deciding the motions to disqualify, the district court focused on the manner in which the challenged representations originated. The court observed that:

> [T]he first case, in which the plaintiffs include Laskey Bros. of West Virginia, Inc., came to the firm of Malkan & Isacson at a time when that firm was disqualified from handling it.... At the time of the retainer, Mr. Isacson was disqualified from handling any such case; and since

Mr. Malkan was then his partner, he was equally disqualified from handling the case.

> As Mr. Malkan, as well as Mr. Isacson, was disqualified from handling that case at a time when it first came to their office, this disqualification cannot be cured by the dissolution of the partnership. Once the attorney was disqualified from handling the case, he remains disqualified.

*Id.* at 519–520 (footnote omitted).

With respect to the Austin matter, the district court arrived at a different conclusion. The court, again focusing on the timing, emphasized that the Austin "case first came to Mr. Malkan after the partnership with Mr. Isacson had been dissolved and that Mr. Isacson had never had any association with the case." *Id.* at 520. The court refused to grant the motion to disqualify, rejecting the theory that "having once been a partner with a man who was disqualified from handling a case of that nature, [Malkan] could never thereafter handle such a case...." *Id.* The court observed that there was no evidence that Malkan had acquired confidential information from Isacson about Isacson's former clients.

On appeal, the Second Circuit affirmed the district court's holdings. With regard to the Laskey case, the reviewing court observed that "all authorities agree that all members of a partnership are barred from participating in a case from which one partner is disqualified." *Laskey Bros. of W.Va. Inc. v. Warner Bros. Pictures,* 224 F.2d at 826. The Second Circuit expressly affirmed the distinction the district court drew between the Laskey and Austin cases. That is, the circuit court recognized that disqualification in the Laskey matter was required because the challenged representation originated in a context in which the law firm originally retained was clearly disqualified. "[O]nce a partner is ... vicariously disqualified from a particular case," the Second Circuit noted, "the subsequent dissolution of the partnership cannot cure his ineligibility to act as counsel in that case. The decision in Laskey is there-

fore affirmed." *Id.* at 827. With regard to the Austin matter, which the Second Circuit described as "a new case having no relationship to the old partnership," the court observed that the inference that Malkan received confidential information from Isacson was rebuttable and, indeed, had been rebutted. *Id.* at 827.

The present case is factually similar to the Laskey matter. Representation of the plaintiffs with respect to the claims framed in the complaints in the cases at bar originated in disqualification. The clients did not come to attorney Fredericks after he left the disqualified firm; rather, the representation commenced and continued for approximately two years while Fredericks was affiliated with Certilman and while the facts demonstrating the conflict were known to him and his firm. The investors who first made contact with Fredericks did so through Cioti's "ongoing" association with other Certilman attorneys. *See* Transcript at 4–5. The close relationship between the subject matter of the firm's representation of Cioti and the firm's prior, adverse representation of the movants was then, or soon became, known. Under such circumstances, to allow the challenged attorney, in part by virtue of his having left the disqualified firm, to rebut the presumption would provide an escape hatch to firms and attorneys who take on and continue conflict-laden representation. On these facts, we believe the better view is that rebuttable presumption analysis is inapplicable.

The *Laskey* opinions preceded the development of the Second Circuit's recently articulated "restrained approach" to disqualification questions. *McAlpin, supra,* 625 F.2d at 444. While the opinions in that litigation are consistent with the Second Circuit's "restrained" perspective, rather than resting our decision solely on the principles discussed in the *Laskey* opinions and explored immediately above, we have examined the facts of this case under a rebuttable presumption standard.

■ We noted earlier that an attorney who has undertaken successive representation of clients with adverse interests on substantially related matters is conclusively presumed to be privy to relevant confidential disclosures. *See Evans, supra,* 715 F.2d at 791. It is also "well established that a court may not inquire into the nature of the confidences alleged to have been revealed to the tainted attorney. To require proof of access to privileged information would 'put the former client to the Hobson's choice of either having to disclose his privileged information in order to disqualify his former attorney or having to refrain from the disqualification motion altogether.'" *Cheng, supra,* 631 F.2d at 1056 (quoting from *Government of India, supra,* 569 F.Supp. at 740). Under a rebuttable presumption, however, the attorney with access to confidential information is permitted to demonstrate that he did not share in any confidential information. While a court must be mindful not "to make the standard of proof for rebuttal unattainably high," *Laskey, supra,* 224 F.2d at 827, care must also be taken, in applying a rebuttable presumption, not to put the movants in the Hobson's choice outlined above.

Our examination thus focuses on the proof the challenged attorney has offered in the context of this case. We conclude that attorney Fredericks has failed to carry the burden of rebutting the presumption that he shared the movants' confidences.

■ In this case, as we have observed, the challenged representation germinated and developed in disqualification. It is undisputed that Certilman, through the challenged attorney, undertook the representation of Cioti and the other investors at a time when the firm was clearly disqualified by virtue of the substantially related prior representation. Under DR–5 105(D), Fredericks, although he joined the firm after the adverse representation of the movants had terminated, was touched by Certilman's disqualification.

■ Early in 1985, at the latest, Fredericks became aware of the fact that his firm was engaging in successive, adverse representation of clients in substantially related matters. At this time, as noted earlier, the representation of Cioti and others with re-

spect to their investments in the Programs had just begun. Armed with the knowledge of the conflict, Fredericks and his firm should not have continued the representation.[8] *See Funds, supra*, 567 F.2d at 234 n. 18 (attorney who worked closely with Morgan, Lewis firm, which represented an accounting firm, "should not have accepted ... retainer" to sue the accounting firm because attorney knew of conflict months before lawsuit against accounting firm was filed).

■ The representation of Cioti and the other investors continued despite the awareness of the conflict. There is evidence of continued access to the privileged files subsequent to the commencement of Certilman's representation of Cioti on the Great Western matters; there is, by contrast, no evidence of the erection of formal "Chinese walls." These and the other facts marshaled above suggest at a minimum an appearance of impropriety in Certilman's representation of Cioti and the other investors. While we do not rest our disqualification holding on this basis,[9] the facts adduced are appropriate contextual considerations relevant here in determining whether the proof offered is sufficient to overcome the presumption that the challenged attorney has shared confidences which it is conclusively presumed the movants disclosed to the Certilman firm.

■ A number of Certilman attorneys worked on the representation of the Amtax defendants with respect to their respective roles in GWE 1982 and GWE 1983–I. *See* Levine Affidavit at ¶ 4 and exhibits thereto. It appears that all of these attorneys were affiliated with the firm when Fredericks joined in late 1984. *See* Affidavit of Gene Schleppenbach, Esq. in Support of Motion for Disqualification and Exh. A thereto. Yet none of these attorneys has submitted supporting affidavits to corroborate Fredericks' affirmation that he was not privy to client confidences disclosed to the attorneys. By contrast, in *Silver Chrysler, supra*, one of the Second Circuit cases on which plaintiffs rely, supporting affidavits of the attorneys who had performed work in connection with the prior adverse representation were submitted to the court. *See also McAlpin, supra*, 625 F.2d at 442–43 (Second Circuit notes district court's reliance on sworn corroborative affidavits in examination of screening procedures).

The absence of supporting affidavits is particularly important in this case in which it appears (i) that the Certilman attorneys who represented the Amtax defendants were affiliated with the firm at the time of the subsequent adverse representation, (ii) that plaintiff Cioti was an "ongoing client" of Certilman's and was introduced to attorney Fredericks by one or more Certilman attorneys, and (iii) that the representation of Cioti and the other plaintiffs developed in a context in which the firm was concededly disqualified. It is not clear from the record whether the attorney or attorneys who introduced Cioti to Fredericks shared Certilman's access to the Amtax defendants' confidences. Similarly, it is not clear to what extent other Certilman attorneys, besides Fredericks, worked on the present cases prior to Fredericks' de-

---

8. Obviously, the best way to avoid conflicts is to have inhouse procedures which ferret out potentially problematic situations. *See* Kline and Dougherty, *Avoiding Client Conflicts of Interest in an Era of Corporate Change*, 14 AIPLAQJ 104 (1986).

The concurrent representation of Levine and the plaintiffs in late 1984 and early 1985 presented a serious conflict. Concurrent "adverse representation is prima facie improper" under the case law *even if the representations are not substantially related. Cinema 5 Ltd. v. Cinerama, Inc.,* 528 F.2d 1384, 1387 (2d Cir. 1976); *Waterbury Garment Corp. v. Strata Productions,* 554 F.Supp. 63, 66 (S.D.N.Y.1982); *see also* Miller and Warren, *Conflicts of Interest and*

*Ethical Issues for the Inside and Outside Counsel,* 40 Bus. Lawyer 631, 655 (Feb. 1985). It appears that the concurrent representation problem was identified and, at some point, affected by the departure of Evan Gordon from Certilman. The record is unclear, however, with respect to when Gordon left the firm and how much time transpired between the point at which the conflict was recognized and the point at which Gordon left. *See* Transcript at 18; *see also* Letter from Barry Fredericks to the Court (Feb. 24, 1987).

9. The appearance of impropriety is rarely a sufficient basis for disqualification. *See McAlpin, supra*, 625 F.2d at 446.

parture from the disqualified firm.[10] Proof on these issues has not been offered.

Fredericks affirms that he did not share any of the confidences disclosed by the movants to the Certilman attorneys. He concedes that "[w]hen the initial question of a conflict of interest arose ... I ordered the files from the [firm's] warehouse." Fredericks Affidavit at ¶ 7. He states, however, that he "never looked" at these files and that he concluded on the basis of files the movants' attorneys sent to him that "there was a clear conflict of interest and therefore no further investigation in the matter was necessary." *Id.* Nevertheless, as noted previously, the firm's and Fredericks' representation of those who would become the plaintiffs in the present actions continued for nearly two years after Certilman and Fredericks had actual notice of the conflict. Fredericks does not contend that during these months clearly defined institutional screens or other mechanisms were established at Certilman to safeguard against the deliberate or inadvertent sharing of disclosures the movants may have made to other Certilman attorneys. There was no "Chinese wall" per se. Indeed, Levine affirms that Fredericks, after learning of Certilman's prior representation of the movants, gave Levine the impression that he would review the relevant files developed in the course of the firm's prior representation of the Amtax defendants. *See* Levine Affidavit at ¶ 10. While Fredericks categorically denies that he shared any of the client confidences in his firm's possession during the many months when he was investigating the investors' concerns, on these facts the naked denial is insufficient to rebut the presumption that Fredericks shared in such information.

We believe that Fredericks is "potentially in a position to use privileged information." *Nyquist, supra,* 590 F.2d at 1246; *see also Cheng, supra,* 631 F.2d at 1059. There is in the court's view a danger here that the balance of presentations in this litigation could be tainted by one side's "unfair advantage." *Cheng, supra,* 631 F.2d at 1059.

We recognize that for a number of reasons disqualification motions are generally disfavored. The timing of motions to disqualify often suggests that the movants have made a strategic decision to delay proceedings. *See McAlpin, supra,* 680 F.2d at 436 (Court notes that disqualification motion was filed "almost two years after commencement of the action"); *see also Bottaro v. Hatton Associates,* 680 F.2d 895, 897 (2d Cir.1982) (Court emphasizes that "motion was filed late in discovery stage and well after defendants knew" of facts bearing on disqualification question). In addition, a literal application of ethical rules will frequently result in an injustice. A client will lose the benefit of services performed by his attorney often at a time when it was permissible for the attorney to have rendered those services.

In this case, as noted earlier, the circumstances do not suggest that the motion to disqualify was filed late or in an effort to cause delay. *See* note 4, *supra.* We do not believe it is unjust to require new counsel in the circumstances presented here. Almost all of the efforts of the challenged attorney took place at a time when he was a member of a firm which he now concedes was disqualified by virtue of circumstances which he became aware of early on in the representation of Cioti and prior to the representation of others who would become plaintiffs in these actions. In addition, the danger the Court perceives of tainted litigation has not been adequately rebutted. Accordingly, the motion to disqualify is granted.

SO ORDERED.

---

**10.** *See* note 3, *supra.*