WORLDSPAN, L.P., et al., Plaintiffs,

v.

The SABRE GROUP HOLDINGS, INC. et al., Defendants.

No. 1:98–CV–0098–CAM.

United States District Court,
N.D. Georgia,
Atlanta Division.

May 1, 1998.

Order on Reconsideration July 13, 1998.

Tony Glen Powers, Rogers & Hardin, Atlanta, GA, David Boies, phv, Boies & Schiller, Armonk, NY, William A. Isaacson, phv, Jonathan D. Schiller, phv, Thomas C. Goldstein, phv, Boies & Schiller, Washington, DC, for Plaintiffs.

Frank Garrett Smith, III, Michael P. Kenny, Philip Rogers Stein, Elise Kirban, Alston & Bird, Atlanta, GA, J. Edd Stepp, phv,

Robert E. Cooper, phv, Gibson, Dunn & Crutcher, Los Angeles, CA, for Defendants.

## ORDER

MOYE, District Judge.

This case is before the Court on the plaintiffs' motion to disqualify the defendants' local law firm in this active tort litigation. For the reasons set forth below, the motion is **GRANTED.**

The law firm has served for several years, and currently is still serving, as counsel for plaintiffs in state tax matters in Georgia and Tennessee. This litigation as well as the tax matters all involve in different ways and to different degrees plaintiffs' computer airline reservations operation. The main computer located physically in Atlanta, Georgia, is the heart of plaintiff's entire business.

Local Rule 83.1(C) of this Court provides that "All lawyers practicing before this court shall be governed by and shall comply with . . . the Code of Professional Responsibility and Standards of Conduct contained in the Rules and Regulations of the State Bar of Georgia and with the decisions of this court interpreting those rules and standards."

The Georgia Code of Professional Responsibility provides (Ga. DR 5–105(A) and (C)):

"(A) lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5–105(C).

*   *   *   *   *   *

"(C) In the situation covered by DR5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interests of each **and** if each consents to the representation **after full** disclosure of the possible effect of such representation on the exercise of his independent professional Judgment on behalf of each." Emphasis added.

The above Directory Rules of the State Bar of Georgia are a verbatim adoption, in relevant part (one phrase of 5–105(A) of the ABA Rule is omitted), of identically num-

bered Directory Rules of the American Bar Association's Model Code of Professional Responsibility. The ABA/BNA Lawyer's Manual on Professional Conduct addresses the issues covered by those sections and here involved (ABA/BNA Lawyers' Manual on Professional Conduct, Practice Guide, § 51:101):

"A lawyer may not represent one client whose interests are adverse to those of another current client of the lawyer's, even if the two representations are unrelated, unless the clients consent and the lawyer believes he or she is able to represent each client without adversely affecting the other. Courts and ethics panels generally take a broad view of this restriction, and a specific adverse effect probably will not have to be shown. All that need be present is that one lawyer or firm is representing two clients, even in unrelated matters with potentially conflicting interests. The rules with respect to concurrent representation of conflicting interests are rooted in a lawyer's duty of loyalty to the client. This is generally considered a somewhat greater obligation than the one the lawyer owes to a former client, which is to protect client confidences and secrets.

"Clients may consent to simultaneous representation following full disclosure. Even where consent is given, however, it may be clear that one lawyer or law firm cannot represent both parties. When consent is not given or when dual representation is not possible under the rules, lawyers engage in concurrent conflicting representations at their own risk, for they may be required to withdraw from *both* clients' cases if they haven't taken care of the conflict before entering into both relationships. Once the dual representation has begun, courts are usually reluctant to simply let a firm pick and choose which client to keep and which to drop. Generally, screening devices, such as Chinese Walls, are rarely held to be effective in this type of situation for avoiding imputed disqualification of an entire firm".

By its plain language, the Georgia State Bar Code of Professional Responsibility, and, by adoption, this Court require **both** a show-

ing that adequate representation of both clients is probable, and also the informed consent of both clients. *Glover v. Libman,* 578 F.Supp. 748, 760 (N.D.Ga.1983.Forrester, D.J.):

> "If it is both 'obvious' to the lawyer that he can represent the interests of each client adequately, and agreeable by 'consent' to each client that the lawyer represent each client, however, multiple representation is permitted."

In this case, it is clear that defendants have given their informed consent, and while plaintiffs question the adequacy of their representation in the highly partisan context of this case, the court believes there is little reason to question the law firm's competent and adequate representation of plaintiff's interests in the pending state tax matters. The plaintiffs have raised the possibility of hostile use of confidential information obtained in he course of the law firm's tax representation. There is insufficient evidence before the Court for it to make a finding of probable breach of confidentiality or hostile use. And where the issue is the hostile use of confidential information, this Court has placed the burden of proof on the party seeking disqualification. *Dodson v. Floyd,* 529 F.Supp. 1056, 1061 (N.D.Ga., 1981), a case however involving a former client. That burden may not be applicable, or may shift, where simultaneous, directly adverse, representation is involved. Furthermore, where the basic subject matter of both representations is the same, even though the nature and purposes of the representations are different, as here, substantial consideration is due the non-consenting client's fears and concern about use of confidential information, thus emphasizing the wisdom of requiring **both** informed consent and a finding of no adverse effect. In this connection, see *Cinema 5, Ltd. v. Cinerama, Inc.,* 528 F.2d 1384, 1386[5] (2nd Cir.1976). Thus, pretermitting the question of probable breach of confidentiality or adverse use, the critical issue now before the court is whether plaintiffs have given their informed consent to the simultaneous, dual representation.

It is clear that when informed specifically that the law firm had undertaken to represent the defendants in this instant lawsuit brought by plaintiffs, the plaintiffs strenuously objected. The law firm, however, relies on its "standard" engagement letter sent to plaintiffs when their first representation was undertaken, September 16, 1992, to show that plaintiffs then prospectively gave the required consent to the present simultaneous, dual representation in this lawsuit commenced over five years subsequent to the claimed consent. While the significant lapse of time, and, indeed, an apparent on-again, off-again, series of representations in the interval, would seem to make it most difficult for a consent that may have been thoroughly informed in 1992 to be informed in 1998, in view of the pace of change in the world, and indeed in the airline and computer industries, it is not impossible, but, as one court has said, "such standing consent must by necessity be exceedingly explicit." *Florida Ins. Guaranty Assn., Inc. v. Carey Canada,* 749 F.Supp. 255, 260 (S.D.Fla.1990). The client-lawyer relationship is *sui generis;* it is based on mutual trust; it has important public implications beyond the mere relationship between the parties; it is not a mere contractual arrangement such that contract law relating to releases and waivers forms very persuasive precedent, nor does the court find such precedent helpful here. The requirements of this court's rules governing the conduct of lawyers practicing before it, and, of course, of the Georgia Code of Professional Responsibility, transcend mere contract law. The language of an engagement letter, while important to determine the nature and scope of any consent to representation of other clients, and to what extent such consent, if any, is "informed", does not definitively circumscribe the scope of the lawyer's professional responsibility under the circumstances. While not applicable here as experienced lawyers for plaintiffs were monitoring the engagement of the law firm, in the more normal situation, the lawyer, presumably possessing superior legal knowledge and experience, is presenting the prospective client with a document with legal implications prepared by the lawyer having possibly adverse effects on the client seeking his legal advice and to repose trust in him. It is the lawyer's duty to insure that each client has

all the necessary information to make consent truly informed. The Court must determine whether the 1992 letter did in fact evidence an informed prospective consent to the precise simultaneous, dual representation undertaken in this case.

In this connection, it is necessary to refer to the language of that letter (Exhibit A to plaintiffs' motion to disqualify). Its relevant language follows:

"As we have discussed, because of the relatively large size of our firm and our representation of many other clients, it is possible that there may arise in the future a dispute between another client and WORLDSPAN, or a transaction in which WORLDSPAN's interests do not coincide with those of another client. In order to distinguish those instances in which WORLDSPAN consents to our representing such other clients from those instances in which such consent is not given, you have agreed, as a condition to our undertaking this engagement, that during the period of this engagement we will not be precluded from representing clients who may have interests adverse to WORLDSPAN so long as (1) such adverse matter is not substantially related to our work for WORLDSPAN, and (2) our representation of the other client does not involve the use, to the disadvantage of WORLDSPAN, of confidential information of WORLDSPAN we have obtained as a result of representing WORLDSPAN.

"We have advised you that we have served as special counsel to Delta Air Lines for certain types of matters, including state and local tax matters. We do not view our work for Delta to be in conflict with our representation of WORLDSPAN, and Delta ... has consented to our representation of WORLDSPAN. We have also advised you that we have represented American Airlines. We do not believe our representation of American Airlines is in conflict with our representation of WORLDSPAN. We have also represented various other airlines from time-to-time on limited matters ... we do not view our representation of any of these carriers to be in conflict with our proposed representation of WORLDSPAN."

*   *   *   *   *   *

"If any of the foregoing is not consistent with your understanding of the terms of our engagement, I would appreciate your advising me in writing as soon as possible so that we may resolve any misunderstanding. If you have any questions or wish to discuss any of these points, please give me a call."

The substance of the law firm's evidence with respect to the letter is that there was no response thereto by plaintiffs and the representation was thereupon commenced and continued without demur even though there were several periods of time in which no work was performed.

The substance' of plaintiffs' testimony with respect to the letter is that plaintiffs, by house counsel, took immediate objection, in 1992, to the possibility of future direct litigation against then by the law firm, and insisted upon immediate written notice of any such intended adverse litigation. Plaintiffs' witness asserts this position was conveyed by fax to the law firm, and followed by a telephone conversation with the lawyer in charge of plaintiffs' matters at the law firm, the result of which was that the lawyer stated there would be no change in the standard letter, and the representation simply continued.

The parties agree that the determination of the question of what, if any, follow-up there was to the letter must be based upon credibility determinations involving the memories of the law firm's tax lawyer and plaintiffs' house counsel, both of whom appear to the court to be striving to express the truth as they recall it, based on time sheets, fax identifications and the like. The court finds it unnecessary to engage in such a determination.

■ Looking only at the original letter itself, the Court finds that its very language is ambiguous. The phrase "will not be precluded from representing clients who may have interests adverse to WORLDSPAN so long as (1) such adverse matter" does not necessarily or even impliedly foreshadow fu-

ture directly adverse litigation. It is the opinion of this Court that future directly adverse litigation against one's present client is a matter of such an entirely different quality and exponentially greater magnitude, and so unusual given the position of trust existing between lawyer and client, that any document intended to grant standing consent for the lawyer to litigate against his own client must identify that possibility, if not in plain language, at least by irresistible inference including reference to specific parties, the circumstances under which such adverse representation would be undertaken, and all relevant like information. *Cinema 5, Ltd. v. Cinerama, Inc., supra; Florida Ins. Guaranty Assn., Inc. v. Carey Canada, supra.*

■ The Court believes the above point to carry added weight when, as here, the future conflict is caused by undertaking the representation of a client with whom the law firm has no present relationship. The law firm points out that at the time the letter was sent, the law firm advised the plaintiffs that it either currently, or in the past ( "we have represented American Airlines"—a valid construction of that phrase would be that no current representation existed) had represented American Airlines, stating however: "We do not believe our representation of American Airlines is in conflict with our representation of WORLDSPAN." The record shows that American Airlines is a subsidiary of AMR Corporation (AMR). The Sabre Group are 80% owned by AMR. There was no suggestion that the Law Firm had ever represented AMR, or the Sabre Group, and no suggestion that it considered it had a standing obligation to represent any entity owned by or connected to either AMR or American Airlines, or, indeed, that it had the expectation of being so requested. The defendants here are simply new clients requesting representation by the law firm five years after the "standard" letter of representation was sent. Without in any way suggesting such to be the case here, to weaken the requirement of informed consent so that general letters of standing consent, that is, waivers of professional obligations as set forth in the applicable codes of professional responsibility, suffice would, in this Court's opinion, drastically denigrate the lawyer's unique po-

sition of trust with his client and go far towards permitting the relationship to depend merely upon the non-appearance of a more substantial client. For this reason, and in conformity with the rule enunciated in the ABA Manual of Professional Responsibility, the Court also holds that, absent informed consent, a conflict situation cannot be resolved after the conflicted representation has occurred by the law firm's withdrawal from the least desired representation.

The Court has previously noted that the Local Rule which it is enforcing refers both to the Standards of Conduct of the State Bar of Georgia and also the decisions of this Court interpreting those standards. The Court, however, must make sure that its interpretations are consistent with the mainstream of current legal thought and law, and not provincial, and therefor looks to decisions from other jurisdictions by which it is bound and which it finds persuasive. This is necessarily so because the interstices of local interpretation are wide. Thus, in addition to the State Bar's Disciplinary Rules, the Court finds of almost equal persuasion, the ABA Code of Professional Conduct upon which the Georgia Rules are so closely modeled. The Court has found most useful in this regard the Proposed Final Draft Nos. 1 and 2, Restatement of the Law Third, Restatement of the Law Governing Lawyers, of the American Law Institute. This draft has not yet been approved by the A.L.I., but its discussion of the applicable articles, sections 201, 202, and 209, and the supporting citations have been most helpful in obtaining an overview of the interests and principles involved as interpreted by courts throughout the nation. The Restatement is particularly helpful by reason of its recognition of the evolving nature of the legal profession.

The Court now finds that the law firm's representation of defendants herein is in prohibited conflict with its ethical duties to and position of trust with plaintiffs, and orders it disqualified from further representation of defendants. As the result of this disqualification, it shall be necessary for the defendants to secure new local counsel (L.R. 83.1.B and E.4).

## ORDER ON RECONSIDERATION

MOYE, District Judge.

The Defendants' motion for reconsideration of this Court's disqualification order dated May 1, 1998, (# 44–1) is **DENIED** for the reasons set forth below.

The above order dealt principally with the issue of whether a letter of standing consent constituted the informed consent required for simultaneous adverse representation by a lawyer, it being agreed that the applicable Standards of Conduct required both informed consent as well as an "obvious" ability to represent both clients adequately. The court decided that issue against defendants. The defendants, in their present motion, do "not seek to re-litigate that issue", but argue that, conceding for the purposes of their motion a violation of the Standards of Conduct, disqualification is too harsh a remedy. In support of their position, they have provided the court with an initial memorandum as well as a reply to plaintiffs' memorandum in opposition. While the numerous cases cited by the parties in their memoranda are instructive and illustrate the efforts of the several courts involved to apply the same or similar principles to diverse factual situations, they obviously do not constitute factual precedent. Thus, it is useful to set forth the principles as to which there is substantial agreement.

▇ First, it is "common ground between the parties and for the Court in addressing the Motion to Disqualify that a violation of DR 5–105(b) does not *automatically* require disqualification." Plaintiffs' memorandum, p. 2; Defendants' reply memorandum p. 4. The court agrees. While the court's decision to disqualify did not automatically follow upon its finding that plaintiffs had not given informed consent to the simultaneous dual representation, the court agrees that its reasoning should have been set forth with greater specificity.

▇ Secondly, the court agrees with defendants that before imposing the sanction of disqualification there must be something more than a technical violation. Defendants' reply memorandum, p. 8. There must be substance to the violation, something that moves the court to find that disqualification, rather than some other remedy, is appropriate. The court thus finds appropriate the reasoning in *Gould, Inc. v. Mitsui Mining & Smelting Co.,* 738 F.Supp. 1121, 1124–25 (N.D.Ohio, 1990), cited at page 5 of defendants' initial memorandum:

> [T]wo separate questions must be answered in order to resolve this motion: First, whether [the law firm] has violated DR 5–105; and, second, in the event that the first question is answered in the affirmative, whether this violation requires [the firm's] disqualification in this case. The importance of this second question cannot be [overstated], as disqualification of counsel in an action which has been pending for some time is but one of several alternatives and is a drastic measure which courts will not impose unless absolutely necessary.

While the last sentence quoted shows the difference factually between that case and this where the issue was raised immediately and before any other business was taken up (and the court notes that the question of timing or estoppel appears to have been the critical consideration in many of the cases cited), the court agrees that there are two separate, but closely related, issues which must be decided: violation *vel non* and sanction.

▇ As noted above, the court does not now have before it the issue of violation *vel non*, but the question of what is the appropriate sanction is closely related to the substance of the violation. Although the court's earlier order was based on a finding of lack of informed consent, it did not proceed forthwith and without consideration of all the factors involved to order disqualification. Nor did it *sub silentio* find it "obvious" that the law firm could adequately represent the interests of both clients. The court found the law firm could adequately represent the plaintiffs in the pending state tax matters because defendants would have no adverse interest, and indeed, being in the same business, would probably find plaintiffs' success in such local tax matters beneficial in precedent, if not in actuality should they operate in the same states.

But the problem lies in whether that tax representation could provide defendants an advantage in the instant contested tort litigation. It is simplistic to suggest that tax matters are such a tightly compartmentalized part of a business, or indeed of a large law firm's practice, that a court can assume it "obvious" that there can be no relationship between such practice and the firm's other corporate or litigation practice, or that, a firm's litigation department may, almost by reason of their description, take positions adverse to the clients of its tax, patent and trademark, real estate and other specialized departments. Indeed, it would be more probable that the firm's own tax lawyers would feel slighted by such a proposition. A tax lawyer must, at least as a general proposition, be familiar with all aspects of a client's business to give sound advice on most tax problems. And, in the process of achieving such familiarity he must talk to his client's employees, ask them questions, see files, and the like. As the court noted in its earlier order, it assumed, and there has been no counter suggestion, that the subject matter of the state tax matters was property in or relating to, or income deriving from, plaintiffs' computers and their operation in plaintiffs' business. Those computers are likewise central to the litigation before this court.

In its earlier order of May 1, 1998, the court quoted at pages 2 and 3 from the ABA/BNA Lawyers' Manual on Professional Conduct, Practice Guide, § 51:101:

> Once the dual representation has begun, courts are usually reluctant to simply let a firm pick and choose which client to keep and which to drop. Generally, screening devices, such as Chinese Walls, are rarely held to be effective in this type of situation for avoiding imputed disqualification of an entire firm.

Thus, within the framework of DR 105(A) and (C), the court could not find it obvious that defendants' law firm could adequately represent plaintiffs in the context of its concurrent adverse representation of defendants in this litigation. Having this view of the first prong of the Directory Rule, adopted by this Court as its own rule, and in the absence of informed consent, the court does not view the violation as merely technical, but as presenting the real possibility of substantial and meaningful conflict.

Nevertheless, the court agrees with the defendants that it must address in specific detail whether it was a proper exercise of the court's discretion to order disqualification. There are several factors which entered into its determination which the court will discuss below.

First. It should be noted that the Directory Rules have a definite prophylactic purpose which is most importantly to preserve the integrity of the legal process itself (*Amatuzio v. Gandalf Systems Corp.*, 932 F.Supp. 113, 115 (D.N.J.1996)), and also the public's confidence in that process. Thus, where there is a violation, the court's primary purpose should be the elimination of risk of further impairment of the process. *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746 (2nd Cir. 1981).

The court cannot forecast what course this case will take. If plaintiffs' case survives preliminary motions, it very probably will involve substantial discovery. That was true in the companion matter in this court, *Worldspan v. Abacus*, 1:98–cv–0099–CAM. At this point in the litigation process it would be difficult, if not impossible, to predict what letter, document or other piece of information may prove significantly relevant even if not now so recognized. That piece of information conceivably might now be in the attorneys' possession or where they know how to find it. Knowledge of filing systems, responsibilities of specific employees and their habits, which employees would have what information, and a myriad like pieces of unconsciously absorbed information can have great value to an attorney engaged in discovery. That fact suggests that, absent the court's ruling, discovery could become burdened with unnecessary issues not dealing with the merits of the discovery process itself.

Second. Importantly, the disqualification issue was raised at the very outset of this litigation, and there can be no lost time or effort occasioned by the disqualification order, other than by its litigation. As the court has previously noted, delay in raising the

issue, or what was perceived by a court as estoppel by conduct, has been a critical factor in several disqualification cases.

Third. While the court has never considered that defendants' Atlanta counsel were so engaged merely to comply *pro forma* with this Court's local rules, the court nevertheless remains of the opinion that other counsel are defendants' primary counsel, able competently to litigate this particular matter in association with other local counsel. In so finding, the court emphasizes that it does not in the least doubt the ability of defendants' Atlanta counsel competently to handle this entire matter.

Fourth. While the court recognizes that there is, or has been, debate as to the weight to be given to mere appearance of impropriety as an independent ground for disqualification, it is a factor to be given weight in the determination of whether disqualification is the appropriate remedy. In *Waters v. Kemp,* 845 F.2d 260 (11th Cir.1988), the Court of Appeals found that appearance of impropriety standing alone would not constitute a ground for disqualification except in the rarest cases. *Id.* at 265–266. In that case the Court had previously found no basis for the primary ground on which disqualification was sought. *Id.* at 264. The conflict of interest is here patent, based on the clear language of the Directory Rule itself, not simply an appearance of impropriety. It is the classic exemplar of prohibited conflict antedating directory rules and model codes of professional conduct.

The ordinary layman would be astonished to learn that a lawyer could receive substantial fees to represent a client and be able to litigate against that same client in another matter at the same time. The existence of that possibility should certainly prevent any client from placing 100% trust and confidence in his lawyer. The court believes such a possibility would not be conducive to public trust in the legal profession.

The court believes that the second prong of D.R.105, which requires informed consent based upon specific information provided by the lawyer, has as a specific purpose the prevention of such a situation. That provision gives clients a measure of control over the use, or misuse, of their confidences and enforced would prevent unnecessary litigation over what is "obvious". The client will know better than the court what is its exposure by such adverse dual representation.

In a contested matter like this the determination of the truth of the matter might well require a lengthy factual hearing involving difficult questions of how to determine the materiality and relevance of all that was exposed (e.g., documents, personal relationships, organizational structure and the like) by the initial representation, as well as substantial questions of credibility as was urged upon the court by defendants with respect to whether the plaintiffs had indeed informed defendants' lawyers at the inception of their lawyer-client relationship, as claimed, that they would not permit any hostile representation by the lawyers. Defendants' Memorandum in Opposition to Plaintiffs' Motion to Disqualify Counsel, pp. 3, 10, 14–19. Defendants assert:

> Although the Plaintiffs' version of the events in 1992 is inherently suspect, the facts pertaining to the circumstances of Alston & Bird's limited-representation of Worldspan are controverted, with disagreements going to such fundamental issues as the existence of a contract, whether any modification to that contract was attempted, whether any such modification was received, the scope of the professional relationship and a host of other disputed facts.

(Defendants' Memorandum in Opposition to Plaintiffs' Motion to Disqualify Counsel, p. 10). Having found against the defendants on the consent question, the court, faced with a "host" of sharply disputed facts relating to "fundamental issues", would necessarily have been required to hold a factual hearing, a mini-trial, that could have swallowed the case-in-chief, or at least seriously impaired the truth-finding function as to the real merits, had it not ordered disqualification.

The court recognizes the necessity of reconciling these factors with the developing legal profession now involving very large law firms with perhaps hundreds of lawyers with many specialties and very large clients with

numerous, perhaps hundreds, of subsidiaries and affiliates. In many cases perhaps there will be truly technical violations where the dual representation does not really impinge upon the client's interests and consent will be given. The court notes that the record in this case contains nothing indicating that plaintiffs' refusal to consent was a tactical maneuver designed to improve their chances in the litigation before the court.

Likewise, the court recognizes the importance to the public as well as to the client of the ability of the client to select its own lawyer. But this right of course should be limited to selecting a lawyer not already engaged by its opponent. Bidding contests for lawyers are no more in the interest of client or public than the suggested possibility of a large company's engaging all the competent lawyers in a given locality in order to hamper litigation against it. That is not the case here, and in a jurisdiction such as this, the court can confidently predict it to be a virtual impossibility. While a client's freedom of choice of attorney is an important consideration, this case involves a determination of which client's freedom of choice is entitled to protection by the court, and the public interest is involved on both sides, not merely the defendants'.

In sum, it was consideration of the above factors which led the court to order the disqualification of defendants' Atlanta counsel.

While the court is sympathetic to the defendants' motion for certification for interlocutory appeal (# 44–2), it must be **DENIED**. The court cannot make the findings required by 28 U.S.C. § 1292(b). The issue before the court does not involve a controlling question of law. The law is clear. All that was involved, once a violation was found, was the exercise of the court's discretion in determining what sanction was appropriate. *F.D.I.C. v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1311 (5th Cir.1995). Nor would its review by the Court of Appeals materially advance the ultimate termination of this litigation. In *Richardson–Merrell, Inc. v. Koller*, 472 U.S. 424, 434, 105 S.Ct. 2757, 86 L.Ed.2d 340 (1985), the United States Supreme Court held:

When an appellate court accepts jurisdiction of an order disqualifying counsel, the practical effect is to delay proceedings on the merits until the appeal is decided. As in this case the appellate court may stay all proceedings during appellate review. Even where the appellate court fails to impose a stay, it would take an intrepid District Judge to proceed to trial with alternate counsel while her decision disqualifying an attorney is being examined in the Court of Appeals.

The delay accompanying an appeal results not only where competent alternate counsel had already entered appearances and participated in the litigation, such counsel will need time to gain the knowledge of the disqualified attorneys. But where the disqualification decision of the trial court is correct, this delay is unavoidable. We do not think that the delay resulting from the occasionally erroneous disqualification outweighs the delay that would result from allowing piecemeal appeal of every order disqualifying counsel.

We also decline to view the disqualified attorney's personal desire for vindication as an independent ground for interlocutory appeal.

*See also* James William Moore et al., *Moore's Federal Practice,* §§ 201.11 et seq. (3rd ed.1998); Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction* 2d, §§ 3911 et seq.

While compliance with L.R. 83.1.B and E.4 is required, the court will not strike pleadings and briefs already filed as that would cause further delay in this case.