**MONTGOMERY ACADEMY, Plaintiff,**

v.

**Carolyn KOHN et al., Defendants.**

**No. Civ. 98–4013(JCL).**

United States District Court,
D. New Jersey.

May 24, 1999.

Diane K. Weeks, Mendham, NJ, for plaintiff.

Alan Milstein, Sherman, Silverstein, Kohl, Rose & Podolsky, Pennsauken, NJ, for defendant Carolyn Kohn.

**OPINION**

CHESLER, United States Magistrate Judge.

## I. INTRODUCTION

This matter comes before the Court on the motion of Defendant Carolyn Kohn to disqualify Plaintiff's counsel, Diane K. Weeks, Esq. Oral argument was heard on January 11, 1999 and an evidentiary hearing was conducted on March 15, 1999.

For the reasons stated below, Defendant's motion to disqualify Plaintiff's counsel, Diane K. Weeks, Esq., is granted.

## II. BACKGROUND

The following facts are gleaned from the certifications submitted by the parties in support of or opposition to the Defendant's motion to disqualify Plaintiff's counsel and from the transcript of the March 15, 1999 evidentiary hearing held on the matter (hereinafter "Tr.").

Montgomery Academy (the "Academy") is a state-approved private school for emotionally handicapped or disabled children located in the State of New Jersey. *See* Certification of Defendant Carolyn Kohn (hereinafter "Kohn Cert.") ¶ 2. Defendant Carolyn Kohn ("Ms.Kohn") was the founder of the Academy and served as its Director until February 1997. *See* Kohn Cert. ¶ 3; Tr. at 7.

Ms. Kohn met Plaintiff's counsel, Diane K. Weeks, Esq. ("Weeks"), sometime in early 1996. *See* Tr. at 8. They were introduced by Dr. Virginia Murray ("Dr.Murray"), their mutual periodontist, who was also a personal friend of Ms. Kohn and a fairly new Academy Board Member. *See* Tr. at 8, 160–61; Certification of Diane K. Weeks, Esq. in Opposition to Defendant Carolyn Kohn's Disqualification Motion (hereinafter "Weeks Cert.") ¶¶ 16–17.

In June of 1996, Ms. Kohn needed to hire a lawyer to negotiate the Academy's lease renewal. *See* Tr. at 7–8. She called Diane K. Weeks, Esq. *See* Tr. at 8–10. Ms. Weeks and Ms. Kohn met at the Academy on June 17, 1996 and discussed the Academy's lease renewal. *See* Tr. at 9–12, 84–85. They agreed that Ms. Weeks would negotiate the lease on the Academy's behalf; however, no letter of retention or other written agreement was made to that effect. *See* Tr. at 11–12, 85–86, 89. According to Ms. Weeks, she informed Ms. Kohn that the Academy's Board of Directors ("the Board") would have to vote to retain her on their behalf before she would be officially retained. *See* Tr. at 87–88, 154–55.

Shortly after this meeting at the Academy, on June 27, 1996, Ms. Kohn and Dr. Murray attended a meeting of the "Hemlock Investors" at which they discovered that the "Hemlock Investments" were part of a "Ponzi Scheme" and that all the investment monies were probably lost. *See* Tr. at 13. The Academy Pension Plan had significant investments in Hemlock, as did Ms. Kohn herself. *See* Tr. at 13–14. Ms. Kohn was also a trustee of the Academy's Plan. *See* Tr. at 14. After the meeting, Ms. Kohn expressed her concern to Dr. Murray about the investments in Hemlock that both she and the Academy had and they agreed that she should call Ms. Weeks as soon as possible. *See* Tr. at 13, 59–61, 170–71.

Ms. Kohn called Ms. Weeks when she got home from the meeting that night, anxious to discuss what she had learned with an attorney. *See* Tr. at 14, 91. Ms. Kohn and Ms. Weeks spoke the following day, June 28, 1996, and Ms. Kohn briefly told Ms. Weeks what had transpired at the Hemlock meeting. *See* Tr. at 92–93. They met two days later, on June 30, 1996, at Ms. Weeks's house. *See* Tr. at 16–17, 93. Ms. Kohn apparently shared with Ms. Weeks what she had learned about the Hemlock Investments and they listened to an audio tape which Ms. Kohn had made of the Hemlock Investors meeting on June 27, 1996. *See* Weeks Cert. ¶ 24.

During the meeting, Ms. Kohn claims that she "shared with [Ms. Weeks] everything that [she] could think of, everything that had gone on and also [her] feelings and [her] concerns and [her] worries . . ." about the Hemlock Investments. *See* Tr. at 17. According to Ms. Kohn, at this time and in the days to follow she considered Ms. Weeks to be her personal lawyer and thought that Ms. Weeks would protect her. *See id.* In her certification, Ms. Kohn stated that she "met with Ms. Weeks several times. During those sessions, I told

her everything I knew and remembered concerning my role as Trustee and other relevant facts. We examined all documents and audiotapes of meetings together." Kohn Cert. ¶ 11. Ms. Kohn went on to say that she "was always under the impression that Ms. Weeks was representing [her] and had [her] interests in mind when discussing these matters with [her]." *See* Kohn Cert. ¶ 12. Ms. Kohn testified that she had sought Ms. Weeks's help both for herself and for the school because she was "fearful for the school, [she] was fearful for [her]self, [and she] was fearful for the employees." Tr. at 59–61. Furthermore, Ms. Kohn claims that she discussed with Ms. Weeks the possibility of Ms. Weeks representing both Ms. Kohn and the Academy and that Ms. Weeks said to her, "I could probably do that. I could bill you separately." *See* Kohn Cert. ¶ 15; Tr. at 19, 61.

Ms. Weeks's version of the June 30, 1996 meeting is quite different. According to Ms. Weeks, she made clear to Ms. Kohn during the meeting that she represented the Academy, that a separate retention letter would have to be issued for Ms. Weeks to handle the Academy's investment problems, and that Ms. Kohn would have to get separate counsel if she had individual liability. *See* Tr. at 120, 129–30. Ms. Weeks claims that she deflected any attempts by Ms. Kohn to discuss Ms. Kohn's personal investments or involvement. *See* Tr. at 119–20; Weeks Cert. ¶¶ 25–26.

At the time of the June 30, 1996 meeting between Ms. Weeks and Ms. Kohn, the Academy's Board of Directors had neither voted on nor knew about Ms. Weeks's anticipated representation of the Academy for either the lease renewal or the pension plan. *See* Tr. at 18. Although Ms. Kohn had told Ms. Weeks that she would be retained to represent the school, the only other person affiliated with the school who was aware of this agreement was Dr. Murray, a fairly new Board member.[1] *See* Tr.

---

1. In fact, Dr. Murray testified that at the time she did not really consider herself a Board member. Dr. Murray gave the following testimony: "I was only on the Board a very few months and I really didn't think of myself in

at 18, 148–50. On the basis of Ms. Kohn's representation that the Board would vote to retain her for the lease negotiation at their next meeting, Ms. Weeks claims that she considered herself to be the Board's attorney at that time. *See* Tr. at 120, 148–50, 155–56. Ms. Kohn, however, seemed to believe that Ms. Weeks was her attorney as well as the Academy's. *See* Tr. at 63–64.[2] Nonetheless, Ms. Kohn did identify Ms. Weeks as the "school attorney" in her mileage logs and time records during this time. *See* Tr. at 49.

Shortly after the June 30th meeting, Ms. Weeks had occasion to research whether or not Ms. Kohn might have individual liability under ERISA for the Hemlock Investment loss and discovered that Ms. Kohn's mere status as a Pension Plan trustee could create individual liability. *See* Tr. at 130. In her Certification, Ms. Weeks stated that "On July 4, 1996, I reviewed for the first time some ERISA materials and re-read the Complaint [brought by Hemlock Investors against promoters of the investment scheme]. I realized then that Ms. Kohn and Singer probably had liability but I thought that either one or both could shift liability to Genovese and Wager [the Academy's pension plan consultants]. I proceeded with caution because Kohn might have an irreconcilable conflict with the Plan." Weeks Cert. ¶ 32. According to Ms. Weeks, she informed Ms. Kohn of this potential immediately prior to the July 8, 1996 Board meeting. *See* Tr. at 130–31. Ms. Weeks allegedly stated to Ms. Kohn, "I want to give you a heads-up. You have to get separate counsel, or I think you're going to

have to get separate counsel. I can't make that determination, but you should understand that I can't-I represent the school." Tr. at 131.

Ms. Kohn did remember Ms. Weeks telling her that she was going to represent the school and not Ms. Kohn, but did not remember it happening before the July 8, 1996 Board meeting. *See* Tr. at 19–20. According to Ms. Kohn, sometime after the July 8, 1996 Board meeting, she approached Ms. Weeks in the restaurant where Board meetings were usually held and Ms. Weeks said to her, "Get yourself a lawyer." *See* Tr. at 20. Ms. Kohn stated that she was shocked by this statement. *See id.*

On July 8, 1996, the Academy's Board met and was introduced to Ms. Weeks for the first time by Ms. Kohn. *See* Tr. at 19, 97. According to Ms. Kohn, to her surprise, Ms. Weeks asked her to leave the room so that Ms. Weeks could speak to the Board outside her presence. *See* Tr. at 19. Ms. Kohn stated that she was reluctant to leave the meeting, but obliged. *See id.* Dr. Murray also remembers Ms. Weeks asking Ms. Kohn to leave the meeting. *See* Tr. at 173–74. Dr. Murray stated that she was in attendance at the meeting Ms. Weeks first attended and that Ms. Weeks "took control of the situation pretty quickly, got Carolyn out of the room, asked Carolyn Kohn to leave the room. Mentioned something in an underhanded way about, 'I'm going to represent the Board.' " *See* Tr. at 173–74. This came as a surprise to Dr. Murray, who had previously thought

that context. By that time Carolyn and I were friends, and I recommended Diane to Carolyn on a personal basis." Tr. at 168–69.

**2.** What is apparent from the testimony given at the evidentiary hearing is that Ms. Kohn's long involvement with the Academy, an institution she had a large role in establishing in 1970 and which she ran until 1997, led Ms. Kohn to feel that her interests and the Academy's interests were so intermingled as to be united. According to Ms. Weeks, Ms. Kohn "ran the school as a dictatorship." *See* Tr. at 7, 156. Ms. Kohn herself testified that on

June 17, 1996 she felt that Ms. Weeks was working for both her and the school. *See* Tr. at 63. Dr. Murray's testimony suggests that Ms. Kohn was not the only person who viewed Ms. Kohn and the school as one. Regarding her referral of Ms. Kohn to Ms. Weeks for the school's lease negotiation, Dr. Murray stated, "Carolyn Kohn was having a lease negotiation situation, and she mentioned it to me, and she said that her attorney was not strong, she wasn't comfortable, and she needed someone strong to represent her. And I said, well, call Diane Weeks." Tr. at 169.

of Ms. Weeks as Ms. Kohn's attorney. *See* Tr. at 174. However, Dr. Murray stated that the "whole situation changed at that Board meeting. Diane Weeks started to talk to the Board, directly to the Board about how they were all there on a personal basis, they were all possibly personally liable." *Id.*

Ms. Weeks's version of that Board meeting is different. According to Ms. Weeks, she did not ask Ms. Kohn to leave the meeting, and relayed to the Board in Ms. Kohn's presence everything that Ms. Kohn had told her at their June 17, 1996 and June 30, 1996 meetings, including telling the Board that "Kohn may need individual representation, and that [she] would be looking into that." Tr. at 132. Indeed, in Ms. Weeks's Certification, she states that she "took pains to inform the Board that Kohn and Singer had personal liability but that [she] would see whether it was an irresolvable conflict." Weeks Cert. ¶ 34.

Ms. Weeks was later formally retained by the Board to represent the Academy for the lease negotiation and the pension plan matter. *See* Certification of A. Barbara Owens, President of the Board of Plaintiff Montgomery Academy (hereinafter "Owens Cert.") ¶ 10 & exhs. A & B. The retention letters also reflect that during the July 8, 1996 meeting the Board authorized Ms. Kohn as Director to act on behalf of the Academy in both matters. *See* Owens Cert., exhs. A & B. As a result, in the weeks following the meeting, Ms. Kohn and Ms. Weeks met on several occasions to review documents and discuss other matters relating to Ms. Weeks's representation of the school. *See* Tr. at 133–34; Weeks Cert. ¶ 37. According to Ms. Weeks, Ms. Kohn attempted several times during those weeks to discuss her personal liability with Ms. Weeks, and each time Ms. Weeks would remind her to get an attorney or ask her if she had hired an attorney yet. *See* Tr. at 135–37; Weeks Cert. ¶ 37. Interestingly however, Ms. Weeks stated in her Certification that on July 15, 1996, she "researched Kohn's individual liability and told her that she had to get *new* counsel as soon as possible but

before the next Board meeting." Weeks Cert. ¶ 40 (emphasis added). On July 29, 1996, the Board met again and Ms. Weeks "informed the Board that Kohn had individual liability that could not be shifted. [She] also told the Board that [she] had so informed Kohn." Weeks Cert. ¶ 44.

In early August 1996, Ms. Kohn did hire her own personal attorney. *See* Tr. at 76, 137–38. According to Ms. Kohn, she hired Paulette Pitt to represent her shortly after Ms. Weeks told her to get an attorney. *See* Tr. at 76. Ms. Pitt accompanied Ms. Kohn to the August 7, 1996 Board meeting, but not long after Ms. Kohn was again unrepresented. *See* Tr. at 140. Ms. Kohn then hired Richard Collier to represent her. *See id.* Mr. Collier attended a Board meeting in September 1996 with Ms. Kohn and, according to Ms. Weeks, urged Ms. Weeks to "take Carolyn [Kohn] back into school representation." *See* Tr. at 140–41. In her Certification, Ms. Weeks stated that in a phone call with Mr. Collier he told her that she "had a conflict with being the School attorney because Kohn had hired [her]." Weeks Cert. ¶ 50. Yet, Ms. Weeks testified that Mr. Collier never raised the issue of her previously being Ms. Kohn's attorney. *See* Tr. at 142. According to Ms. Weeks, the first time this issue was raised was in November of 1998. *See* Tr. at 142–43. However, James A. Crawford sent Ms. Weeks a letter on October 10, 1996 specifically charging that Ms. Weeks's previous attorney-client relationship with Ms. Kohn created a conflict of interest and required Ms. Weeks to disqualify herself from the case since the Board then viewed Ms. Kohn in an adversarial light. *See* Brief in Support of Defendant Carolyn Kohn's Motion to Disqualify Plaintiff's Counsel (hereinafter "Kohn Brief"), exh. B, letter from James A. Crawford to Diane K. Weeks of Oct. 10, 1996. Ms. Weeks apparently answered this letter and denied the truth of the allegations. *See* Tr. at 147–48.

Ms. Weeks has continued to represent Montgomery Academy and, on August 26,

1998, filed a Complaint on behalf of the Academy naming Carolyn Kohn as the lead defendant. Ms. Kohn moved to disqualify Ms. Weeks on November 25, 1998, on the basis of Ms. Weeks's prior attorney-client relationship with Ms. Kohn. According to Ms. Kohn, confidential information obtained by Ms. Weeks during the course of that relationship is now being used against Ms. Kohn by the Academy in this suit.

The Academy has objected to Ms. Weeks's disqualification, arguing that Ms. Kohn never hired Ms. Weeks to represent her personally and that disqualifying Ms. Weeks at this point in the litigation would place a substantial hardship upon the Academy.

This Court heard Oral Argument on the motion on January 11, 1999 and an evidentiary hearing was conducted on March 15, 1999 during which Ms. Kohn, Ms. Weeks, and Dr. Murray, among others, testified.

### III. DISCUSSION

■ The Local Civil Rules for the United States District Court for the District of New Jersey provide that:

> [t]he Rules of Professional Conduct of the American Bar Association as revised by the New Jersey Supreme Court shall govern the conduct of the members of the bar admitted to practice in this Court, subject to such modifications as may be required or permitted by Federal statute, regulation, court rule or decision of law.

L.Civ.R. 103.1(a) (1999). Thus, to resolve questions of professional ethics, this Court turns to the New Jersey Rules of Professional Conduct ("RPCs"). *See Essex Chem. Corp. v. Hartford Accident & Indem. Co.*, 993 F.Supp. 241, 245–46 (D.N.J. 1998); *Carlyle Towers Condominium Ass'n, Inc. v. Crossland Sav., FSB*, 944 F.Supp. 341, 344–45 (D.N.J.1996); *Host Marriott Corp. v. Fast Food Operators, Inc.*, 891 F.Supp. 1002, 1006–07 (D.N.J. 1995). "It is clear that the intention is for practitioners in both the state and federal courts in New Jersey to be governed by a single ethical code." *Carlyle Towers*, 944 F.Supp. at 344–45. "Nevertheless, while efforts should be made to avoid inconsistent determinations under the RPCs, and this Court may certainly look for guidance to the decisions of the New Jersey state courts, our local rules do not require that this Court be bound by those decisions." *Id.*

■ This motion to disqualify Plaintiff's counsel must be carefully scrutinized because "[m]otions to disqualify are viewed with 'disfavor' and disqualification is considered a 'drastic measure which courts should hesitate to impose except when absolutely necessary.'" *Alexander v. Primerica Holdings, Inc.*, 822 F.Supp. 1099, 1114 (D.N.J.1993) (*citing Schiessle v. Stephens*, 717 F.2d 417, 420 (7th Cir.1983)); *see also Essex Chem.*, 993 F.Supp. at 246; *Carlyle Towers*, 944 F.Supp. at 345. Therefore, close judicial scrutiny of the facts of each case is "required to prevent unjust results." *Gould, Inc. v. Mitsui Mining & Smelting Co.*, 738 F.Supp. 1121, 1126 (N.D.Ohio 1990); *see also Carlyle Towers*, 944 F.Supp. at 345. "Disqualification questions are intensely fact-specific, and it is essential to approach such problems with a keen sense of practicality as well as a precise picture of the underlying facts." *Gould*, 738 F.Supp. at 1124 (*citing Huntington v. Great Western Resources, Inc.*, 655 F.Supp. 565, 567 (S.D.N.Y.1987)); *see also Carlyle Towers*, 944 F.Supp. at 345.

■ Furthermore, these situations do not arise in a vacuum. "[T]he ethical rules should not be blindly applied without consideration of relative hardships." *Gould*, 738 F.Supp. at 1124. When considering motions to disqualify, there will most likely be hardships for one client if their attorney is disqualified, as well as possible hardships for the other if the attorney is allowed to proceed against them. Thus, a delicate balance must be maintained between "the sacrosanct privacy of the attorney-client relationship (and the professional integrity implicated by that relationship) and the prerogative of a party to proceed

with counsel of its choice." *Schiessle,* 717 F.2d at 420; *Carlyle Towers,* 944 F.Supp. at 345. Besides weighing these factors, the court must also consider its "obligation to maintain high professional standards and to ensure that the trial of the claims in the case will be free from taint." *Huntington,* 655 F.Supp. at 567; *see also Steel v. General Motors Corp.,* 912 F.Supp. 724, 733 (D.N.J.1995) ("Resolution of a motion to disqualify requires the court to balance 'the need to maintain the highest standards of the [legal] profession' against 'a client's right to freely choose his counsel.' "), *aff'd sub nom, Cardona v. General Motors Corp.,* 942 F.Supp. 968 (D.N.J. 1996); *Carlyle Towers,* 944 F.Supp. at 345.

In the case at bar, Ms. Kohn asserts she had an attorney-client relationship with Ms. Weeks, or at a minimum, that Ms. Weeks jointly or concurrently represented her and the Academy. In the context of that relationship, Ms. Kohn claims that she divulged information and confidence to Ms. Weeks, thereby precluding Ms. Weeks from representing the Academy in this case against her. Thus, in determining whether disqualification is appropriate, the preliminary issue for this Court is whether an attorney-client relationship existed between Ms. Weeks and Ms. Kohn during which confidential information was conveyed. *See, e.g., Host Marriott,* 891 F.Supp. at 1007 (disqualification requires existence of a prior attorney-client relationship); *In re County of Bergen,* 268 N.J.Super. 403, 409, 633 A.2d 1017, 1020 (App.Div.1993) (same); *Bagdan v. Beck,* 140 F.R.D. 660, 667–68 (D.N.J.1991) (same); *Guerrero v. Bluebeard's Castle Hotel Inc.,* 982 F.Supp. 343, 346 (D.Vi. 1997) (same).

## A. Attorney–Client Relationship

■ An attorney-client relationship can be express or implied. To establish an implied attorney-client relationship "a party must show (1) that it submitted confidential information to a lawyer, and (2) that it did so with the reasonable belief that the lawyer was acting as the party's attorney." *Pain Prevention Lab, Inc. v.*

*Electronic Waveform Labs, Inc.,* 657 F.Supp. 1486, 1495 (N.D.Ill.1987); *Guerrero,* 982 F.Supp. at 347 ("An implied attorney-client relationship arises, however, only if confidential information is in fact transmitted from the prospective client to the lawyer, and if the prospective client divulged such confidences with the reasonable belief that the lawyer was acting as the party's attorney."); *Polyagro Plastics, Inc. v. Cincinnati Milacron, Inc.,* 903 F.Supp. 253, 256 (D.P.R.1995); *First Hawaiian Bank v. Russell & Volkening, Inc.,* 861 F.Supp. 233, 238 (S.D.N.Y.1994) ("an attorney-client relationship exists if the party divulging confidences and secrets to an attorney believes that he is approaching the attorney in a professional capacity with the intent to secure legal advice"); *see also Rhone–Poulenc Rorer Inc. v. Home Indem. Co.,* 32 F.3d 851, 862 (3d Cir.1994) (noting that the first traditional element of the attorney-client privilege is that the "asserted holder of the privilege is *or sought to become* a client") (emphasis added).

■ Here, the Court finds that an implied attorney-client relationship did exist since Ms. Kohn undeniably conveyed confidential information to Ms. Weeks with the reasonable belief that Ms. Weeks would represent her or did in fact represent her. At a minimum, Ms. Kohn reasonably believed that Ms. Weeks represented her *and* the Academy jointly, based on Ms. Kohn's view that her interests and the Academy's interests were aligned.

The testimony regarding the June 30, 1996 meeting between Ms. Weeks and Ms. Kohn during which they discussed the Hemlock Investment problem leaves this Court with no doubt that confidential information was provided to Ms. Weeks by Ms. Kohn indicating that Ms. Kohn had potential liability for, at the least, nonfeasance for failing to exercise her fiduciary obligations. For example, the "to do" list created by Ms. Weeks and Ms. Kohn during the June 30, 1996 meeting evidently referenced Ms. Kohn's personal invest-

ment in "High Mountain," Ms. Kohn's personal insurance policy, and documents which related to Hemlock that Ms. Kohn and Ms. Weeks needed to review. *See* Tr. at 68–69, 74–76, 79–80. This uncontroverted evidence clearly shows that Ms. Kohn's personal concerns were, at a minimum, discussed and considered by Ms. Kohn and Ms. Weeks during the meeting.

 Thus, even if Ms. Weeks thought she was potentially going to represent both parties as of the June 30, 1996 meeting, the information she learned at that meeting alone should have, and apparently did, put her on notice that there was such an inherent conflict between Ms. Kohn and the Academy that she could not represent either of them. *See, e.g., DeBolt v. Parker,* 234 N.J.Super. 471, 484, 560 A.2d 1323, 1330 (Law Div.1988) ("When an attorney represents potentially and foreseeably adverse interests ... and the adversity becomes actual, counsel must withdraw from any representation of both parties and all fees may be forfeited."). In contrast, the Court finds that it was entirely reasonable for Ms. Kohn, who undoubtedly is unfamiliar with attorney ethics rules, to have believed that her interests and the Academy's interests could be in alignment regarding Hemlock based on their mutual interest in recovering the pension funds.

Ms. Weeks's protestations that she told Ms. Kohn early on that she represented the Academy and could not represent Ms. Kohn seem to ring hollow, since, by Ms. Weeks's own admission, Ms. Kohn "ran the school as a dictatorship." *See* Tr. at 156. The idea that, prior to formal retention by the Board, Ms. Weeks would tell Ms. Kohn that she worked only for the school cannot be credited. Ms. Weeks ob-

viously needed Ms. Kohn's approval and recommendation to get hired by the Board.[3] Furthermore, Ms. Kohn's testimony that Ms. Weeks told her she could represent both Ms. Kohn and the Academy simultaneously seems the more reasonable position. This is further confirmed by Ms. Weeks's testimony that she consistently told Ms. Kohn that she *"might* need separate counsel". Tr. at 96, 122 (emphasis added). Ms. Weeks's repeated use of the word "might" strongly suggests that in Ms. Weeks's mind, it seemed possible that Ms. Kohn would not need separate counsel and that she could possibly be represented along with the Academy by Ms. Weeks. The contradictory testimony Ms. Weeks provides in this regard is highlighted by her Certification, through which she indicates that at the July 8, 1996 Board meeting, where she was retained, she informed the Board that Ms. Kohn had individual liability but that there might not be an "irresolvable conflict" and that she would look into the matter. *See* Weeks Cert. ¶ 34. The only possible interpretation of Ms. Weeks's statement is that she felt there might not be an irresolvable conflict in her representation of both Ms. Kohn and the Academy. Significantly, Ms. Weeks's Certification also indicates that she told Ms. Kohn she "had to get *new* counsel as soon as possible but before the next Board meeting," implying that Ms. Kohn had *old* counsel, *i.e.,* Ms. Weeks herself.[4] *See* Weeks Cert. ¶ 40 (emphasis added). Thus, Ms. Weeks's own statements strongly support Ms. Kohn's view that Ms. Weeks was representing both Ms. Kohn and the Academy jointly.

---

**3.** This fact is bolstered by Barbara Owens's Certification in which she describes how Ms. Kohn invited her to become a Board member in the early 1990s. Ms. Kohn apparently "invited [Owens] to join the Board of Montgomery Academy where [Ms. Kohn] was Executive Director and a 'non-voting' Board member. When [Ms. Kohn] did so, she advised [Owens] that a Board was required for a school like 'hers' but that the Board's role was purely 'advisory.' " Owens Cert. ¶ 2.

**4.** The significance of Ms. Weeks's statements in this regard is highlighted by the fact that these were not slips of the tongue made while giving oral testimony, but rather, were statements made in a sworn certification which Ms. Weeks presumably prepared carefully and deliberately, consciously choosing every word.

The Court therefore finds that an implied attorney-client relationship existed between Ms. Weeks and Ms. Kohn, and that Ms. Kohn reasonably believed that Ms. Weeks was her attorney.

## B. Disqualification

Having determined that an implied attorney-client relationship existed between Ms. Weeks and Ms. Kohn, the Court must now determine whether disqualifications of Ms. Weeks is required in light of the ethical obligations imposed on her under New Jersey and Federal law.

As stated previously, "[w]hen an attorney represents potentially and foreseeably adverse interests ... and the adversity becomes actual, counsel must withdraw from any representation of both parties and all fees may be forfeited." *DeBolt*, 234 N.J.Super. at 484, 560 A.2d at 1330; *see also In re Lanza*, 65 N.J. 347, 351, 322 A.2d 445, 448 (1974) (stating that where an attorney "found himself in a position of conflicting loyalties .... [he] should have immediately withdrawn from the matter, advising both parties to secure independent counsel of their respective choosing."). Thus, where an attorney jointly represents multiple parties and a conflict of interest arises between the two, the attorney is ethically obligated to withdraw and not represent either party. *See Worldspan, L.P. v. Sabre Group Holdings, Inc.*, 5 F.Supp.2d 1356, 1357 (N.D.Ga.1998) ("Once the dual representation has begun, courts are usually reluctant to simply let a firm pick and choose which client to keep and which to drop."); *Coaker v. Geon Co.*, 890 F.Supp. 693, 695 (N.D.Ohio 1995) ("Because Pryatel has been representing both clients, he cannot simply 'decline proffered employment' with one of the two defendants."); *Florida Ins. Guar. Ass'n, Inc. v. Carey Canada, Inc.*, 749 F.Supp. 255, 261 (S.D.Fla.1990) (recognizing that when a conflict of interest arises in the course of a concurrent representation, the attorney cannot simply convert the disfavored client into a former one to avoid the conflict).

Furthermore, the fact that the attorney-client relationship between Ms. Weeks and Ms. Kohn was only implied does not mitigate Ms. Weeks's duty to withdrawal. *See, e.g., Laurelle Mfg. Corp. v. Truly Yours, Inc.*, 1987 WL 6433, at *3 (S.D.N.Y. Feb. 5, 1987) ("A formal prior attorney/client relationship need not be established before disqualification on conflict of interest grounds can be deemed appropriate. In some circumstances, mere consultation with an attorney involving the exchange of confidential information may be enough to disqualify the attorney from opposing the would-be client in subsequent proceedings." (citations omitted)); *see also Liu v. Real Estate Inv. Group, Inc.*, 771 F.Supp. 83, 86 (S.D.N.Y.1991) ("[T]he duty to preserve confidentiality extends to preliminary consultation by a prospective client even though actual employment does not result."). In analogous circumstances to this case, the *Liu* Court noted that "allowing an attorney who is in a position to use confidential information gained through a relationship with the client's adversary would give the client an unfair advantage." *Liu*, 771 F.Supp. at 87.

New Jersey's Rules of Professional Conduct echo this viewpoint, despite the absence of a rule exactly on point. *See, e.g.,* R.P.C. 1.7(a) ("A lawyer shall not represent a client if the representation of that client will be directly adverse to another client"); R.P.C. 1.9(a)(1) ("A lawyer who has represented a client in a matter shall not thereafter ... represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client"). The Canons of Professional Ethics of the American Bar Association also reflect this policy. *See, e.g.,* Model Code of Prof'l Responsibility § DR 5-105(B) ("A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client"); Model Rules of Prof'l Conduct § 1.16(a)(1) (requiring withdrawal from representation when continued representation would require violation of rules gov-

erning attorney-client relationship). The New York Code of Professional Responsibility does, in fact, directly address this situation. *See* N.Y.Jud.Law § EC 4–5 (McKinney 1999), notes of decision ¶ 2, N.Y. State 84–555 ("An attorney representing joint clients must withdraw from the joint representation if information obtained 'in confidence' from one of the joint clients gives rise to a conflict of interest with the other joint client"). Furthermore, in an ethics opinion, the New Jersey Supreme Court came to the same conclusion. *See In re Opinion No. 415*, 81 N.J. 318, 322–23, 407 A.2d 1197, 1199 (N.J.1979) (noting that, where an attorney represents two governmental clients, the attorney "must withdraw when representation of one governmental body in a particular litigation or matter conflicts with an interest or position of the other.").

Here, it is clear that, at a minimum, Ms. Kohn's communications with Ms. Weeks during the June 30, 1996 meeting were, in part, with a view towards her becoming an individual client of Ms. Weeks. During this meeting, Ms. Kohn clearly disclosed confidential information which lead Ms. Weeks to conclude that Ms. Kohn might be personally liable to the school, Ms. Weeks's other potential client. Ms. Weeks was not free, under the applicable ethics rules and decisions, to accept this information, choose which client to represent, and then to utilize the information against one of the two prospective clients.

In light of the above rules and decisions and this Court's finding that an attorney-client relationship existed between Ms. Weeks and Ms. Kohn during which confidential information was conveyed, Diane K. Weeks, Esq. must be disqualified from representing Montgomery Academy in this suit against Carolyn Kohn and others.[5]

---

5. While Plaintiff has shown that disqualification of Ms. Weeks will cause it substantial hardship due to the extensive time and effort Ms. Weeks has put into this case, *see* Tr. at 230–32, the Court finds that this hardship

## IV. CONCLUSION

For the foregoing reasons, the Defendant's Motion to Disqualify Plaintiff's Counsel will be granted. An appropriate order will issue.

does not outweigh the extreme prejudice created by great likelihood that Ms. Weeks will use the confidential information she obtained from Ms. Kohn in the Plaintiff's case against her.